463 So.2d 242 (1984)
JOHNS-MANVILLE SALES CORP., Appellant,
v.
Edward J. JANSSENS and Patsy A. Janssens, His Wife, Appellees.
No. AJ-109.
District Court of Appeal of Florida, First District.
September 26, 1984.
Rehearing Denied November 28, 1984.
*246 H. Franklin Perritt, Jr., and Nick V. Pulignano, Jr., of Marks, Gray, Conroy & Gibbs, Jacksonville, for appellant.
Wayne Hogan, of Brown, Terrell & Hogan, P.A., Jacksonville, for appellees.
ZEHMER, Judge.
Johns-Manville Sales Corporation appeals a final judgment entered on a jury verdict awarding Edward Janssens $707,600 compensatory and $750,000 punitive damages and awarding his wife $400,000 for loss of consortium. The jury found Johns-Manville liable for asbestosis Mr. Janssens developed through prolonged exposure to asbestos products, manufactured and sold by Johns-Manville, while serving on board ships with the Navy between 1942 and 1951. Asbestosis is a slowly developing, progressive disease that causes serious lung disabilities.[1] In 1978, he first learned he was suffering from the disease, and shortly thereafter he and his wife sued Johns-Manville on theories of negligence, strict liability, and loss of consortium.
Janssens primarily contend that Johns-Manville knew for many years that prolonged exposure to asbestos dust and fibres was dangerous to a person's health but failed to give any warning thereof. They claim punitive damages because Johns-Manville not only knew of the danger but, they argue, engaged in a deliberate course of conduct intended to cover up and prevent users such as Mr. Janssens from being fully informed of the potential dangers revealed by research data coming into Johns-Manville's possession during the 1930s, 40s, 50s, and 60s. The trial lasted one and one-half weeks. Following the jury verdict, Johns-Manville moved for judgment notwithstanding the verdict on the issue of punitive damages, for entry of a remittitur, and for a new trial. All motions were denied.
Johns-Manville does not question its liability for compensatory damages. It has conceded, for purposes of this appeal, that Mr. Janssens had no prior knowledge of the harmful effects of prolonged exposure to asbestos dust and fibres, that Janssens' condition was caused by exposure to Johns-Manville asbestos products, and that such products did not contain any warning label.[2] Johns-Manville concentrates its arguments on the propriety of submitting the issue of punitive damages to the jury, the excessiveness of the damage award (both compensatory and punitive), and several evidentiary rulings said to constitute reversible error. Johns-Manville argues the following specific points:
I. Whether the court erred in submitting the issue of punitive damages to the jury because:
(a) the evidence is insufficient to support any award of punitive damages, or (b) the rationale for punitive damages, i.e., punishment and deterrence, are both absent, or (c) punitive damages are not proper in mass marketed *247 product litigation when their effect will be to bankrupt the defendant.
II. Whether admission of evidence of Johns-Manville's knowledge of asbestos hazards beyond the date of plaintiff's exposure to defendant's products was harmful error.
III. Whether a new trial is required because excessive and unwarranted damages awarded and inflammatory statements by plaintiff's counsel indicate the jury violated the court's instructions and acted solely out of sympathy, passion, and prejudice.
IV. Whether the admission of Dr. Smith's and Mr. Ruff's deposition testimony taken in other litigation in other states was harmful error.
After careful consideration of the voluminous record, the parties' arguments, and the numerous authorities cited, we affirm.

I

PUNITIVE DAMAGES

(a)
In passing on the legal sufficiency of the evidence to warrant submitting the issue of punitive damages to the jury, the following principles must be kept in mind. Punitive damages may be awarded by the jury when tortious injuries to another are committed with fraud, actual malice, or deliberate violence or oppression, or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard for the rights of others. Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214 (1936). Such damages function as a punishment to the defendant and as a warning and example to deter him and others from committing offenses in the future. St. Regis Paper Co. v. Watson, 409 So.2d 75 (Fla. 1st DCA 1982), rev'd on other grounds, St. Regis Paper Co. v. Watson, 428 So.2d 243 (Fla. 1983). As Justice Ervin stated for the Court in Campbell v. Government Employees Insurance Co., 306 So.2d 525, 531 (Fla. 1975):
In nearly all states punitive damages are recognized to be recoverable. They are no longer looked upon as monstrous but are awarded to vindicate wrongs arising from antisocial behavior. The incentive to bring actions for punitive damages is favored because it has been determined to be the most satisfactory way to correct evil-doing in areas not covered by the criminal law.
The standard for determining whether the evidence provides a legal basis for punitive damages in negligence cases is set forth in Carraway v. Revell, 116 So.2d 16, 20, n. 12 (Fla. 1959):
The character of negligence necessary to sustain an award of punitive damages must be of `a gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.'
This long-recognized standard was recently reaffirmed in White Construction Co. v. DuPont, 455 So.2d 1026 (Fla. 1984) (petition for rehearing pending).
It is not necessary to prove actual malice or intent to cause the particular injury sustained; the requisite malice or evil intent may be inferred from the defendant's having willfully pursued a course of action in wanton disregard of the potential harm likely to result as a consequence of that wrongful conduct. Adams v. Whitfield, 290 So.2d 49 (Fla. 1974); Griffith v. Shamrock Village, Inc., 94 So.2d 854 (Fla. 1957); Kirksey v. Jernigan, 45 So.2d 188 (Fla. 1950).
Johns-Manville argues that, in passing on the propriety of awarding punitive damages in products liability cases, we should consider the following factors described in Judge Robert P. Smith's dissenting opinion in Wackenhut Corp. v. Canty, *248 359 So.2d 430, 441 (Fla. 1978), which were taken from a leading law review article, Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L.Rev. 1257, 1319, n. 5 (1976):
(1) The amount of the plaintiff's litigation expenses; (2) the seriousness of the hazard to the public, (3) the profitability of the marketing misconduct (increased by an appropriate multiple); (4) the attitude and conduct of the enterprise upon discovery of the misconduct; (5) the degree of the manufacturer's awareness of the hazard and of its excessiveness; (6) the number and level of employees involved in causing or covering up the marketing misconduct; (7) the duration of both the improper marketing behavior and its cover-up; (8) the financial condition of the enterprise and the probable effect thereon of a particular judgment; and (9) the total punishment the enterprise will probably receive from other sources.
Id. at 445, n. 14.[3] These factors appear to be reasonable considerations in aggravation or mitigation of punitive damages and, in most respects, are consistent with existing Florida decisions on punitive damages. The Supreme Court stated some years ago that matters in aggravation or mitigation of punitive damages are relevant and admissible in evidence, Rinaldi v. Aaron, 314 So.2d 762 (Fla. 1975), and evidence relevant to the foregoing factors would appear to be admissible under that decision.
The respective province of the trial court and jury in dealing with punitive damages has been well defined in past decisions. E.g., Arab Termite & Pest Control v. Jenkins, 409 So.2d 1039 (Fla. 1982); Walsh v. Alfidi, 448 So.2d 1084 (Fla. 1st DCA 1984); Wackenhut Corp. v. Canty, 359 So.2d 430 (Fla. 1978); American Motors Corp. v. Ellis, 403 So.2d 459 (Fla. 5th DCA 1981); Toyota Motor Co., Ltd. v. Moll, 438 So.2d 192 (Fla. 4th DCA 1983); Piper Aircraft Corp. v. Coulter, 426 So.2d 1108 (Fla. 4th DCA 1983). In Wackenhut, the Supreme Court summarized these respective duties in the following language:
The court is to decide at the close of evidence whether there is a legal basis for recovery of punitive damages shown by any interpretation of the evidence favorable to the plaintiff. Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 222 (Fla. 1936). A legal basis for punitive damages exists where torts are committed in an outrageous manner or with fraud, malice, wantonness or oppression. Id. at 221. Once the court permits the issue of punitive damages to go to the jury, the jury has the discretion whether or not to award punitive damages and the amount which should be awarded. Punitive damages `are peculiarly left to the discretion of the jury as the degree of punishment to be inflicted must always be dependent on the circumstances of each case, as well as upon the demonstrated degree of malice, wantonness, oppression, or outrage found by the jury from the evidence.'
359 So.2d at 435-36. Therefore, if an award of punitive damages may be supported under any view of the evidence taking all inferences most favorable to the plaintiff, a jury issue is made and whether to award such damages is rightly decided by the jury and not by the court. Once a legal basis for punitive damages is established, evidence in mitigation thereof is not properly considered by the court in passing on the question of law whether the case is one in which punitive damages may be allowed. Rinaldi v. Aaron, supra.
A manufacturer ordinarily has "a duty to take reasonable precautions to avoid reasonably foreseeable injuries to those who might use the commodity" and, by placing an inherently dangerous commodity in the streams of commerce, "assumes the duty of conveying to those who might use the product a fair and adequate warning of its dangerous potentialities to the end that the user by the exercise of reasonable care on his own part shall have *249 a fair and adequate notice of the possible consequences of use or even misuse." Tampa Drug Co. v. Wait, 103 So.2d 603, 607 (Fla. 1958). Furthermore, "implicit in the duty to warn is the duty to warn with a degree of intensity that would cause a reasonable man to exercise for his own safety the caution commensurate with the potential danger." Id. at 609. Simply stated, "The user should be protected from unreasonably dangerous products or from a product fraught with unexpected dangers." Copeland v. Celotex Corp., 447 So.2d 908, 912 (Fla. 3d DCA 1984), quoting from West v. Caterpillar Tractor Co., 336 So.2d 80, 86-87 (Fla. 1976).
A legal basis for punitive damages is established in products liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or making adequate disclosure and warning of such danger. E.g., American Motors Corp. v. Ellis, supra; Toyota Motor Co., Ltd. v. Moll, supra; Piper Aircraft Corp. v. Coulter, supra; Dorsey v. Honda Motor Co., Ltd., 655 F.2d 650 (5th Cir.1981). Especially is this so when the evidence is susceptible to the inference that the manufacturer not only refused to warn for the user's protection, but intentionally took steps to cover up the known danger in order to protect continued marketing of the product for its own economic advantage.[4]
The evidence in this case, considered in the light most favorable to the plaintiffs below, is sufficient to establish that Johns-Manville had knowledge, at least from the decade of the 1930s, that prolonged exposure to asbestos dust and fibres would cause the chronic lung disease commonly known as asbestosis.[5] In the early 1900s, it was known that asbestos could cause lung disease, a report thereof having been published in 1907. Additional reports in subsequent years caused Johns-Manville to begin, in 1929, its own research into the relationship between asbestos and lung disease. This initial study was conducted by Dr. A.J. Lanza to determine the effect of asbestos fibre on textile mill workers, and the results were published in 1935 by the United States Public Health Service. The plaintiffs contend that Dr. Lanza's report was not an entirely accurate presentation of the true danger and relationship between exposure to asbestos fibres and resulting asbestosis because the report was altered by editorial changes demanded of Dr. Lanza by Johns-Manville through its then general counsel, Mr. Vandiver Brown. Several letters in evidence, written in 1934, indicate that statements minimizing the risk of prolonged exposure to asbestos contained in Dr. Lanza's original report had been deleted from the final galley proof by Dr. Lanza before publication and that counsel Brown wanted these statements restored. Among the deleted statements were comments suggesting that the study showed that disease caused by asbestos exposure "appeared to be of a type milder than silicosis" and other statements which *250 Mr. Brown said "presented an aspect of your survey that was favorable to the industry and we would like to see them retained." The reason for this editorializing, shown by related correspondence, was to help Johns-Manville and other asbestos companies resist efforts by the New Jersey Legislature to include asbestosis along with silicosis as a compensible industrial disease under the New Jersey Workers Compensation Law then under consideration, by including authoritative comments in the report that asbestosis was not a serious industrial disease or hazard.[6] Mr. Brown sent this information to Raybestos-Manhattan, Inc., another asbestos manufacturer, with the comment that Dr. Lanza would accede to the requested editorial changes before the report was published and that "the interest of your Company in the Report is identical to that of Johns-Manville and it, therefore, follows that whatever we may be able to accomplish will be for the benefit of both." Additional correspondence between Mr. Brown and Sumner Simpson, the president of Raybestos-Manhattan during 1935 and 1939, likewise confirmed that their companies' interests "are best served by having asbestosis receive the minimum of publicity," by using their influence to avoid publication in trade magazines of studies showing the adverse experiences in England and South Africa with the asbestos dust hazard.[7]
There is evidence in the record that Johns-Manville persisted until the 1960s in suppressing information that asbestos dust and fibres would cause asbestosis. One witness, Dr. Kenneth Smith, served as Johns-Manville's medical director from 1944 to 1966, and one of his reports dated in the 1940s indicated that Johns-Manville had a policy of not telling employees about the results of X rays that showed they were suffering from asbestosis, so they "can live and work in peace and the company can benefit by [their] many years of experience." The record also establishes that considerable dispute existed in the medical community from the 1920s to the 1960s concerning the level of dust and fibre concentrations considered too dangerous for workers unless protective measures were taken; but there was no dispute that prolonged unprotected exposure to such dust would likely cause the disease. No warnings of the potential hazards of asbestos dust inhalation were given by Johns-Manville until the 1960s. Dr. Smith had recommended the use of warning labels in 1951 or 1952 or earlier, but Johns-Manville rejected his recommendation because the warnings would have caused decreased product sales. He testified he had discussed the serious dangers of exposure to asbestos fibres with officers and legal counsel of the company in the 1940s and 1950s, saying to them, "We know that we are producing disease in the employees who manufacture these products, and there is no question in my mind that disease is being produced in non-JM employees who may use certain of these products."
Without detailing all the evidence, we conclude the jury could find that Johns-Manville knew asbestos was causing asbestosis in employees working in its plants and in persons using its asbestos products during 1942 through 1951, the period of Mr. Janssens' exposure, and that Johns-Manville not only failed to warn, but deliberately and persistently refused to disclose or disseminate warnings of any danger during that period and for many years thereafter. The jury could reasonably infer from the evidence that Johns-Manville's conduct amounted to a wanton disregard for the health and safety of persons using its asbestos products and evinced a reckless indifference to the potential consequences of *251 its deliberate business decision not to warn the users of its products to take some measures of protection from the potentially harmful effects of prolonged exposure to excessive amounts of asbestos dust and fibres.
Johns-Manville contends the evidence merely shows that it recognized throughout this century asbestos could cause disease and that it was a major participant in relevant research studies conducted over more than fifty years in an attempt to learn the extent of the health hazard from asbestos. It says the evidence reflects that no one knew for certain how much asbestos dust exposure would be injurious to health and that company officials reasonably believed, based on available medical data, that the risk of danger was minimal. Johns-Manville argues that the letters between it and Raybestos-Manhattan "simply reflect the continuing probe on the part of Johns-Manville and Raybestos-Manhattan to discover the truth about asbestos" and clearly "do not reasonably warrant a conclusion that Johns-Manville expressly or tacitly conspired to suppress information from the public concerning risks incidental to exposure to asbestos particles." It points out that shipyard studies made during World War II and reported in the "Fleisher-Drinker" study showed a minor incidence of asbestosis among workers insulating ships with asbestos, that until 1963 the recognized standard for safe exposure was not more than five million particles per cubic foot of air, and that Mr. Janssens was not subjected to working conditions shown to have concentrations in excess of that standard. Johns-Manville concedes, however, that by 1964 this standard was determined by Dr. I.L. Selikoff to be too high.
We need not detail the other arguments made by Johns-Manville to explain the incriminating evidence adduced by plaintiffs. A duty to warn attaches, not when scientific certainty is established, but whenever a reasonable man would want to be informed of the risk in order to decide whether to expose himself to it. Moran v. Johns-Manville Sales Corp., 691 F.2d 811 (6th Cir.1982); Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). Even if the record supports a finding that the medical and scientific community did not appreciate the extent of the risk involved, unanimous agreement among experts as to the hazards posed to insulation workers by asbestos exposure is not a prerequisite to finding that appellees acted recklessly in failing to warn of the health hazards that might be caused by exposure to asbestos; evidence showing that Johns-Manville was "aware of respectable medical authority to the effect that exposure to asbestos posed serious health hazards and yet failed to warn potential users accordingly" is legally sufficient to warrant submission of the punitive damage issue to the jury, "even if there was also evidence showing [Johns-Manville was] simultaneously aware of respectable medical opinion to the contrary." Martin v. Johns-Manville Corp., 469 A.2d 655, 668 (Pa.Super. 1983). It was the jury's function to weigh all the evidence and determine its meaning, judge the credibility of witnesses, draw permissible inferences, and reach its verdict based on the law given by the court's instructions. The various factual considerations here argued by Johns-Manville to explain the incriminating evidence were considered by the jury and obviously rejected. As an appellate court, we could not substitute our view of the evidence for that of the jury even if we were disposed to disagree with the jury's view thereof. Richards Company v. Harrison, 262 So.2d 258 (Fla. 1st DCA 1972).
In concluding that the evidence was sufficient to submit the issue of punitive damages to the jury, we note that similar evidence in other asbestosis cases against Johns-Manville likewise has been held sufficient for reasons we also find persuasive. E.g., Moran v. Johns-Manville Sales Corp., supra; Fischer v. Johns-Manville Corps., 193 N.J. Super. 113, 472 A.2d 577 (App.Div. 1984); Martin v. Johns-Manville Corp., supra; Hansen v. Johns-Manville Products Corp., 734 F.2d 1036 (5th Cir. *252 1984); Neal v. Carey Canadian Mines, Ltd., 548 F. Supp. 357 (E.D.Pa. 1982).

(b)
Johns-Manville contends that as a matter of law punitive damages should not be allowed in this case because the rationale of punishment and deterrence underlying the concept of punitive damages is absent. It argues that the persons who will bear the award are current management, directors, shareholders, employees, and customers who had nothing to do with the alleged misconduct and lack of warnings on asbestos products in the 1930s, 1940s, and 1950s; and since the actual wrongdoers have long been replaced at Johns-Manville, the award can neither punish the absent wrongdoers nor deter them from continued misconduct in the future. Appellant further contends that it has been more than adequately punished by the expenditure of funds in the defense of thousands of suits already filed and many thousands more yet to be filed nationwide. It also argues that the element of deterrence is absent since Johns-Manville modified all its products in the 1960s, began attaching warning statements on its products, and has not manufactured or marketed any thermal insulation product containing asbestos since 1972. Drayton v. Jiffee Chemical Corp., 591 F.2d 352 (6th Cir.1978).
Johns-Manville presented little, if any, evidence to the jury to prove these contentions, which are more properly argued to the jury as factual matters to be considered in avoidance or mitigation of punitive damages. It is for the jury, not the court, to accept or reject these arguments in the exercise of its discretion to allow or deny an award of punitive damages. It would be contrary to principles heretofore recognized in Florida decisions to hold as a matter of law that punitive damages against corporate defendants may be awarded only for punishment or deterring the corporate personnel actually involved in the alleged wrongs. A corporation may be held vicariously liable for punitive damages based on the reckless and wanton misconduct of its employee so long as some fault on the part of the corporation, although not equally reckless, is shown. Mercury Motors Express, Inc. v. Smith, 393 So.2d 545, 549 (Fla. 1981). A claim for punitive damages survives the death of the tort feasor. Johnson v. Rinesmith, 238 So.2d 659 (Fla.2d DCA 1970). And, as previously indicated, punitive damages operate not only to punish the actual wrongdoer but, by way of example, to deter others from committing similar wrongs. The tort feasor sued in this case is Johns-Manville, a corporate entity, not its directors, shareholders, and employees. As a general rule, a corporate entity continues to be liable for its past tortious acts, regardless of any change in its ownership, its directors, or the personnel through whom it acts. We see no reason for carving out an exception to this rule in punitive damages cases.
We note that these same arguments have been made by Johns-Manville in cases in other jurisdictions and rejected for reasons we find persuasive. Moran v. Johns-Manville Sales Corp., supra; Fischer v. Johns-Manville Corps., supra; Martin v. Johns-Manville Corp., supra; Hansen v. Johns-Manville Products Corp., supra; Neal v. Carey Canadian Mines, Ltd., supra.

(c)
For its third alternative argument under point one, Johns-Manville contends that punitive damages should not, as a matter of law, be allowed in mass marketed product litigation. Because thousands of similar cases have already been filed against it and untold numbers are yet to be filed, all seeking compensatory and punitive damages, Johns-Manville argues that the allowance of punitive damages in this and all other cases will bankrupt and destroy the corporation, contrary to the well-recognized principle that punitive damages will not be allowed when to do so will bankrupt the defending tort feasor. Arab Termite & Pest Control v. Jenkins, 409 So.2d 1039 (Fla. 1982), and Hoy v. Poyner, 305 So.2d 306 (Fla. 2d DCA 1974) (The purposes of punitive damages are served "by extracting from [defendant's] pocketbook a sum of *253 money which, according to [its] financial ability, will hurt, but not bankrupt." Id. at 307). Punitive damages, appellant argues, must be imposed in proportion to the offense which has occasioned the injury rather than to the measure of compensation awarded the plaintiff therefor, 17 Fla. Jur.2d, Damages, § 111; for this reason, punitive damages are not required to bear any relationship to the actual compensatory damages awarded, but must reasonably relate only to the defendant's ability to pay. Wackenhut Corp. v. Canty, supra. Johns-Manville concludes that punitive damages should not be allowed as a matter of law in mass marketed product litigation for the reasons stated in Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832 (2d Cir.1967), and Jackson v. Johns-Manville Sales Corp., 727 F.2d 506 (5th Cir.1984).
The validity of the legal principles abstracted from the Florida decisions is not disputed, but those principles do not require that we carve out a special exemption from punitive damages in mass marketed products litigation. Again, the matters here argued by Johns-Manville are more properly addressed to the jury based upon adequate proof of the dire consequences said likely to occur. Certainly, evidence of the adverse effects on Johns-Manville caused by the award of punitive damages in this and other pending asbestos cases is admissible in avoidance or mitigation of punitive damages (see the factors listed from Wackenhut Corp. v. Canty at 445, n. 14, supra). Although such evidence is not properly considered by the court in passing upon the question of law that the case is or is not one in which punitive damages may be allowed, such evidence may properly be considered by the jury. Rinaldi v. Aaron, supra.
The Janssens contend that we should reject these arguments because bankruptcy and the like were not pleaded as an affirmative defense and, therefore, waived. Rule 1.140, Fla.R.Civ.P. We do not reach that question since, as the Janssens point out, one prior judgment for punitive damages was put in evidence by Johns-Manville, and it does not appear that Johns-Manville was precluded from introducing other evidence to demonstrate the disastrous effects on the company which it argues will be caused by awarding punitive damages in this and other pending cases. If the case is one in which punitive damages may be allowed, it is for the jury to determine whether an award of punitive damages will bankrupt or destroy the defendant based on the evidence presented to it. Arab Termite & Pest Control v. Jenkins, supra; Atlas Properties, Inc. v. Didich, 226 So.2d 684 (Fla. 1969).
Johns-Manville concludes that mass product liability litigation such as this case requires a complete reexamination of the whole basis and policy for awarding punitive damages, citing W. Prosser, Law of Torts, p. 13 (4th Ed. 1971), and asks us to fashion a new policy to meet the unique problems presented in such cases. These arguments by Johns-Manville, however, do not comport with the traditional functions of the court and jury regarding the assessment of punitive damages, and have likewise been rejected by other courts for reasons we find persuasive and approve. Moran v. Johns-Manville Sales Corp., supra; Fischer v. Johns-Manville Corps., supra; Martin v. Johns-Manville Corp., supra; Hansen v. Johns-Manville Products Corp., supra; Neal v. Carey Canadian Mines, Ltd., supra.
We decline to follow Jackson v. Johns-Manville Sales Corp., supra, for the reasons stated in Hansen v. Johns-Manville Products Corp., supra, based on our perception that the Texas law on punitive damages is more akin to the Florida law than is the law of Mississippi applied in Jackson. We do not believe the considerations held to preclude punitive damages in Jackson are consistent with Florida law.[8] The arguments against allowing punitive damages *254 in mass product litigation made by Judge Friendly in Roginsky v. Richardson-Merrell, Inc., supra, are pure dictum and have not been accepted by any other court.

II

EVIDENCE OF POST-1951 KNOWLEDGE AND CONDUCT
Johns-Manville argues that any evidence of the company's knowledge of health hazards incident to the use of asbestos beyond 1951, the last year Mr. Janssens was exposed to such products, and its action in connection therewith is wholly irrelevant to any material issue and inadmissable as against public policy. Its objections and the rulings thereon were developed during trial in the following manner.
On the first day of trial, Johns-Manville specifically objected to plaintiff making any comment or introducing evidence (1) concerning the state-of-the-art articles which go beyond 1951, (2) concerning law suits by Johns-Manville employees filed after 1951, or (3) concerning minutes of trade and industrial associations written after 1951. Johns-Manville also objected to the use of any deposition testimony by Dr. Kenneth Smith, Johns-Manville's former medical director, relating to events that occurred after 1951. Initially, the trial court overruled these objections on grounds that Johns-Manville was under a continuing duty to warn and that such evidence was relevant to that issue. After two days of trial, Johns-Manville renewed its objections, contending that plaintiffs had not alleged a continuing duty to warn and, for this reason, could not rely on that ground for admissability. After extensive argument, and after plaintiffs first made and then withdrew their motion to amend the complaint to allege a continuing duty to warn, the trial court was persuaded by Johns-Manville to reverse its prior ruling that the evidence was admissible as relevant to the continuing duty to warn. Nevertheless, the trial court refused to exclude such evidence, ruling that it was relevant to the issue of punitive damages, and especially to plaintiffs' contention that Johns-Manville deliberately covered up the dangers of exposure to asbestos products. Johns-Manville argues that this ruling is erroneous because the evidence objected to does not prove any intent to cover up but, in fact, evidences Johns-Manville's continuing attempts to discover and protect against any defects or hazards attributable to its products and is, accordingly, inadmissible under the rule prohibiting evidence of subsequent repairs, citing Seaboard Airline Railway Co. v. Parks, 89 Fla. 405, 410, 104 So. 587, 588 (1925); City of Niceville v. Hardy, 160 So.2d 535 (Fla. 1st DCA 1964); and Ellis v. Golconda Corp., 352 So.2d 1221 (Fla. 1st DCA 1977).
The specific evidence objected to on appeal is: (1) Deposition testimony of Dr. Kenneth Smith, former medical director of Johns-Manville, that in 1952 he had discussions with Johns-Manville officials in which he recommended the use of warning labels; (2) questions of Mr. C.L. Sheckler, a former occupational health director of Johns-Manville, concerning claims by Johns-Manville employees for workers' compensation benefits, especially a 1959 claim and a related memorandum by Sheckler concerning Johns-Manville's "hush hush" policy of sending employees back to work without disclosing that X rays of the employees indicated the presence of lung disease; (3) testimony of Dr. Scheper, a former director of Saranec Laboratory, relating to a 1955 conference on the potential hazards of asbestos which Johns-Manville officials attended; (4) minutes of the Asbestos Textile Institute meetings held from 1953 to 1963 showing Johns-Manville's participation in meetings and discussions on the hazards of asbestos; (5) portions of business records of the Industrial Health Foundation (Johns-Manville was a member) and, more specifically, correspondence from the foundation's director to Johns-Manville in 1957 showing the extent of Johns-Manville's knowledge of health dangers from exposure to asbestos; (6) questions of Mr. Sheckler about a law suit against Johns-Manville filed in 1957 by an insulation worker claiming injuries *255 from his exposure to asbestos; and (7) deposition testimony of Wilber Ruff, a former Johns-Manville plant manager, concerning the company's continuation during the 1960s of its prior policy of not disclosing the presence of lung disease revealed on X rays of its employees.
The Janssens argue that Johns-Manville's objections lack merit for various reasons. First, they contend, the evidence was properly received to impeach the credibility of Mr. Sheckler, who had been called by Johns-Manville in support of its "state-of-the-art" defense. Johns-Manville insisted before the trial court, and continues to insist before this court, that its legal duty to plaintiffs should be determined and measured by scientific and medical knowledge known to the medical profession and the asbestos industry during 1942 through 1951, the only period relevant to plaintiff's exposure. At trial, Johns-Manville sought to establish through Mr. Sheckler and other evidence that prior to 1964 its company officials were simply unaware that exposure to asbestos dust and fibers in concentrations less than five million particles per cubic foot of air was dangerous to health. Johns-Manville insists that the first scientific and medical evidence indicating a health danger from exposure to less than five million particles per cubic foot of air was released by Dr. I.J. Selikoff in 1964. Immediately thereafter, Johns-Manville took affirmative steps to place warning labels on its asbestos products before anyone else in the industry did so, thereby affirming, according to Johns-Manville, its good faith concern for the safety of its employees and users of its asbestos products. In view of this contention by Johns-Manville, the Janssens argue, Mr. Sheckler was properly subjected to a "stiff cross-examination" and impeachment through use of the specific items of evidence detailed above.
The minutes of the Asbestos Textile Institute meetings for 1953-63 were not received in evidence; only the minutes of an October 8, 1964, meeting were admitted to show the Institute's plan, acquiesced in by Johns-Manville, to employ a public relations representative to counter the adverse impact created by Dr. Selikoff's findings and report. These minutes were admitted to impeach Mr. Sheckler's testimony that Johns-Manville immediately embraced the Selikoff recommendations in 1964. Similarly, the Janssens argue, the Industrial Health Foundation business records were not received in evidence; only specific correspondence referred to in such records was used, and that for the purpose of impeaching Mr. Sheckler's testimony that he was not aware, prior to 1964, of asbestos disease in any person with a history of prolonged exposure from installing asbestos insulation. Likewise, appellees argue, the post-1951 testimony of Mr. Sheckler was also admissible to impeach this testimony professing his lack of knowledge prior to 1964 because it showed that Mr. Sheckler had reported during 1954 through 1957 to his predecessor, Hugh Jackson, on various cases of asbestos disease among insulation workers.
Dr. Smith's testimony concerning his recommendations to use warning labels was properly admitted, the Janssens urge, because that testimony is subject to the interpretation that the recommendations were made prior to 1952, i.e., during the late 40s and early 50s, and thus fall within the period of Janssens' exposure to asbestos which Johns-Manville concedes is relevant. Mr. Ruff, the manager of the Johns-Manville plant in Pittsburg, California, during 1963-66, testified that the policy of not telling employees they were developing asbestosis when such fact was shown on X rays taken by Johns-Manville, as noted in a 1949 written report, continued in effect through the 1960s. The Janssens point out that such X rays were read by Mr. Sheckler, who at the time was the industrial health director for Johns-Manville, and that Mr. Ruff's testimony was therefore relevant to impeach Mr. Sheckler's claimed lack of knowledge and to further corroborate Johns-Manville's plan to prevent public disclosure of the hazards of its asbestos products.
*256 In addition to impeachment, the Janssens contend that the specific items of evidence are also relevant to the defendant's continuing duty to warn, as proof of Johns-Manville's antecedent intent to suppress knowledge of the hazards incident to using its asbestos products, and as proof of a course of continuous wrongdoing that originated before plaintiff was exposed and continued for many years thereafter, which is relevant to the punitive damages claim. Finally, appellees point out that most of the specific items of evidence objected to on appeal were not properly objected to in the trial court and are not properly preserved for appellate review.
It is indeed questionable whether Johns-Manville's objections to the specific items of evidence in the court below are sufficient to preserve these issues for appellate review. But we do not rest our decision on this ground. Admission of the evidence was not reversible error for the following reasons. We agree with appellees that the specific items of evidence complained of on appeal are relevant to rebut Johns-Manville's state-of-the-art defense and to impeach its witness, Mr. Sheckler. The evidence is also relevant to Johns-Manville's continuing duty to warn and its breach thereof. Appellant's continuing duty to warn was properly at issue in the trial court under the plaintiffs' general allegations of negligent failure to warn, and the trial court was in error in ruling otherwise. Cf., Hobbley v. Sears, Roebuck & Co., 450 So.2d 332 (Fla. 1st DCA 1984). Johns-Manville's intent to avoid public disclosure and cover up the health hazards caused by exposure to its asbestos products was also a material issue at trial, as was Johns-Manville's continued malice, evil intent, and reckless and wanton disregard for the health and safety of those using its products. Evidence of repetition and concealment of offensive conduct after it initially occurred is indicative of malice or evil intent sufficient to support punitive damages. Campus Sweater & Sportswear Co., v. M.B. Kahn Construction Co., 515 F. Supp. 64, 102 (D.S.C. 1979), aff'd, 644 F.2d 877 (4th Cir.1981); Grimshaw v. Ford Motor Co., 119 Cal. App.3d 757, 174 Cal. Rptr. 348 (1981); Cf., Ruffin v. State, 397 So.2d 277 (Fla. 1981). See also the factors cited in the dissent in Wackenhut Corp. v. Canty, supra, discussed at page 4, supra.
There is no merit in Johns-Manville's argument that the admission of the specific items of evidence violates the rule precluding evidence of subsequent remedial measures announced in the cited cases and presently codified in section 90.407, Florida Statutes.[9] In the first place, the specific items of evidence are not properly characterized as remedial measures within the meaning of that rule; and, as appellees point out, it was Johns-Manville who offered evidence of warnings placed on their products after 1964 to prove their good faith. But even if we assume that the evidence may be characterized as subsequent remedial measures, evidence of such measures is admissible to impeach a witness's testimony or to disprove the defendant's claimed lack of knowledge. Murray v. Almaden Vineyards, Inc., 429 So.2d 24 (Fla. 2d DCA 1983); Dept. of Transportation v. Webb, 409 So.2d 1061 (Fla. 1st DCA 1982), approved, 438 So.2d 780 (Fla. 1983); Hethcoat v. Chevron Oil Co., 383 So.2d 931 (Fla. 1st DCA 1980). As we view the complained of evidence, it was offered to show the continuation of an intentional course of conduct decided upon prior to the relevant period of plaintiff's exposure to asbestos products and was not offered as proof of remedial or corrective steps taken subsequent to the plaintiff's exposure and resulting disease. Therefore, it was not admitted in violation of the public policy rule against the use of subsequent repairs to prove the negligent acts charged.
*257 Finally, Johns-Manville argues that all of this evidence related to matters collateral to the main issue being tried and should have been excluded for that reason. We agree with appellant that as a general rule evidence received during trial should be limited as much as possible to disputed material issues and related transactions between the parties and that inquiry into collateral matters involving other transactions or parties should not be permitted unless there is reason to believe such evidence may tend to promote the ends of justice. 24 Fla.Jur.2d, Evidence and Witnesses, § 583. But it is equally well established that the exact extent to which cross-examination on collateral matters may go rests almost entirely in the discretion of the trial court, and an appellate court will not interfere with the exercise of the trial court's discretion unless a clear abuse thereof appears. Id., at § 584. Appellants have failed to show such clear abuse of discretion in this instance.

III.

EXCESSIVE DAMAGES AWARD AND THE JURY'S PASSION AND PREJUDICE
This issue comes before us by way of reviewing the trial court's order denying a new trial and a remittitur. The restrictive principles governing such review have been aptly stated.
The correctness of the jury's verdict is strengthened when the trial judge refuses to grant a new trial or a remittitur. The appellate court may review the trial court ruling only for an abuse of discretion.
Two factors unite to favor a very restricted review of an order denying a motion for new trial on ground of excessive verdict. The first of these is the deference due the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record. The second factor is the deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages.
The appellate court should not disturb a verdict as excessive, where the trial court refused to disturb the amount, unless the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.
Lassitter v. International Union of Operating Engineers, 349 So.2d 622, 627 (Fla. 1977). A ruling granting a new trial or remittitur for the above-stated reasons must be affirmatively supported by the record, or there must be a finding that the jury was influenced by matters outside the record. Arab Termite & Pest Control of Florida, Inc. v. Jenkins, supra; Wackenhut Corp. v. Canty, supra.
In support of its demand for a new trial, Johns-Manville argues that the amounts of compensatory damages awarded to Mr. Janssens and to his wife are contrary to the manifest weight of the evidence and that the $750,000 award of punitive damages is out of all reasonable proportion to the alleged tortious conduct, all of which was clearly the result of the jury's sympathy, passion, and prejudice engendered by repeated improper comments and conduct on the part of plaintiffs' trial counsel in complete disregard of the court's having sustained defendant's numerous objections thereto. Appellant contends it was denied a fair trial because the trial judge failed to take control of the proceeding and enforce its rulings that were repeatedly disregarded by plaintiffs' counsel.
We are constrained to agree that the conduct of plaintiffs' trial counsel in this case was far from exemplary[10] and perhaps called for stiffer measures than imposed by the trial judge. But the trial judge sat through it all and is in a far *258 better position than we to judge the impact thereof on the jury. From her position, the trial judge found the conduct was not so offensive as to warrant a new trial and that the damage awards were not so outrageous and against the manifest weight of the evidence as to require setting them aside. Our review of the record fails to reveal any abuse of discretion in this regard.
The record reflects evidence of substantial damages suffered by Mr. Janssens and by his wife. The debilitating disease is a permanent condition which has adversely affected both parties in their daily activities and ability to enjoy life, and it will continue to do so in the future. It does not appear that the jury was unduly influenced by matters outside the record in reaching its verdict. The evidence is legally sufficient to support an award of punitive damages against Johns-Manville, and the amount awarded in this case does not lack any relationship to the alleged misconduct. The amounts awarded for compensatory and punitive damages are not so inordinately large as to shock the judicial conscience, nor do such amounts exceed the maximum limit of a reasonable range within which the jury could properly operate. To hold otherwise would require that we simply substitute our judgment for that of the jury and the trial judge. The trial court's order is supported by the record, and we find no abuse of discretion in denying the motions for new trial and remittur. Bould v. Touchette, 349 So.2d 1181, 1184 (Fla. 1977); Seaboard Coastline R.R. Co. v. Halks, 417 So.2d 282 (Fla. 1st DCA 1982); Louisville & Nashville R.R. Co. v. Hickman, 445 So.2d 1023 (Fla. 1st DCA 1983).

IV

USE OF THE SMITH AND RUFF DEPOSITIONS

(a)

Dr. Smith's deposition
The trial court permitted the Janssens to introduce portions of a deposition of Dr. Kenneth W. Smith taken January 13, 1976, in the case of DeRocco v. Forty-Eight Insulations, Inc., cases number 2880 and 2881, pending in the court of common pleas of Allegheny County, Pennsylvania (filed July 1974). That suit was filed in 1974 by several steel workers subjected to prolonged exposure to asbestos products they had used for insulating plant machinery and pipes, and Johns-Manville was one of fifteen defendants. Johns-Manville objects to the Janssens' use of that deposition, as well as use of a second deposition of Dr. Smith taken April 21, 1976, in Louisville Trust Co. v. Johns-Manville Corp., case number 164922, in the circuit court of Jefferson County, Kentucky.
Johns-Manville, in rebuttal to the trial court's permitting the Janssens to read from the DeRocco deposition, likewise read the cross-examination of Dr. Smith in that deposition. Johns-Manville also read portions of the Louisville Trust deposition, no part of which had been offered by the Janssens. Thereafter, the Janssens read a short portion of the Louisville Trust deposition in rebuttal. The propriety of admitting those portions read by Johns-Manville cannot be questioned. In reading these portions, even though prompted by the court's adverse ruling on its objection, Johns-Manville manifested its belief in the truth of such testimony by adopting and relying upon it. Saudi Arabian Airlines Corp. v. Dunn, 438 So.2d 116 (Fla. 1st DCA 1983). This discussion, therefore, will be confined to whether admitting the portions of the DeRocco deposition offered by the Janssens was reversible error for the reasons argued by Johns-Manville. In general, Johns-Manville objects that the Smith deposition is inadmissible because Johns-Manville has been deprived of a full and fair opportunity to cross-examine Dr. Smith for purposes of the instant case and because the testimony is both irrelevant and inadmissible hearsay. None of these arguments has merit.
Rule 1.330, Florida Rules of Civil Procedure, permits the use at trial of any part or all of a deposition "against any party who was present or represented at the taking of the deposition or who had reasonable notice *259 of it so far as admissible under the rules of evidence." Johns-Manville argues that although attorneys for a Johns-Manville entity (Johns-Manville Products Corp.) were present at the DeRocco deposition, the attorneys now representing appellant Johns-Manville Sales Corporation were not noticed, were not present, and did not have the opportunity to cross-examine Dr. Smith on the specific issues peculiar to this action. For this reason, it says, the requirements for using a deposition under rule 1.330 were not met.
The record reflects that Johns-Manville Sales Corporation is the successor, through merger, to Johns-Manville Products Corporation and that the latter was represented at the deposition by its then counsel, Daniel B. Winters, who cross-examined Dr. Smith at length. In other asbestosis litigation, Johns-Manville has conceded, through its general counsel, that "in a defacto and operations sense there is but one integrated entity, to wit: `Johns-Manville.'" Matter of Johns-Manville/Asbestosis Cases, 93 F.R.D. 853, 856 (N.D.Ill. 1982). We conclude that the requirement of the rule is satisfied to the extent that Johns-Manville was represented by counsel at the deposition.
It is highly questionable, however, that deposition testimony can be used under rule 1.330 unless offered in the same judicial proceeding in which it was originally taken. Dinter v. Brewer, 420 So.2d 932 (Fla. 3d DCA 1982). The scope of the rule is directed more to resolution of the problem presented when the testimony is sought to be used in a supplemental proceeding or retrial, or when another party is added to the proceeding after a deposition has been taken and the added party desires to use such testimony against a party represented by counsel at the deposition. Certainly, rule 1.330 is not intended to supplant the "former testimony" rule, now codified in the Florida Evidence Code, section 90.804(2)(a), Florida Statutes (1983). That section states:
(2) Hearsay Exceptions. The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:
(a) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
The procedural rule and the evidentiary rule must be considered in conjunction; and when the offered deposition testimony meets the requirements of either, it is admissible. Dinter v. Brewer, supra. Accordingly, we do not determine whether Dr. Smith's deposition testimony should be admissible under rule 1.330 because we hold it admissible under the "former testimony" rule.
The "former testimony" rule in section 90.804(2)(a) is the counterpart of Federal Rule of Evidence 804(b)(1) and basically codifies the common law rule of evidence previously recognized. Florida has long permitted the use of former testimony. Putnal v. State, 56 Fla. 86, 47 So. 864 (1908); Habig v. Bastian, 117 Fla. 864, 158 So. 508 (1935). Both sides to this appeal state that the rule applies if the following requirements are met:
1. The former testimony was taken in the course of a judicial proceeding in a competent tribunal;
2. The party against whom the evidence is offered, or his privy, was a party to the former trial;
3. The issues are substantially the same in both cases;
4. A substantial reason is shown why the original witness is not available;
5. The witness who proposes to testify to the former evidence is able to state it with satisfactory correctness. The rationale underlying the former testimony exception was described in Putnal v. State, supra:

*260 `The chief reasons for the exclusion of hearsay evidence are the want of the sanction of an oath and of any opportunity to cross-examine the witness. But where the testimony was given under oath in a judicial proceeding, in which the adverse litigant was a party and where he had the power to cross-examine, and was legally called upon so to do, the great weight and ordinary test of truth being no longer wanting, the testimony so given is admitted, after the decease of the witness, in any subsequent suit between the same parties.'
47 So. at 866. We discern no material distinction between the requirements of the common law rule and the codifications in the Florida Evidence Code or the federal rules of evidence for the purpose of deciding the issue presented here.
Dr. Smith's testimony was taken under oath in a judicial proceeding, contemporaneously recorded by a court reporter, and then reduced to written transcript. As Dr. Smith died prior to this trial, no question is raised about meeting requirements 1, 4, and 5 above. See Habig v. Bastian, supra. Johns-Manville contends, however, that requirements 2 and 3 are clearly not met. Recognizing that no Florida appellate court has yet addressed the specific question presented here, Johns-Manville cites a number of decisions from other state and federal courts and urges three basic contentions based on lack of similarity of issues and lack of similar motive to cross-examine:
1. The issues in the DeRocco case are different from the issue in the present case because (a) DeRocco was based on issues of strict liability, negligence, and breach of warranty, whereas the Janssens' action addressed the additional issue of civil conspiracy; (b) the plaintiffs in the cases are not the same; (c) Janssens' exposure to asbestos occurred at different times, under different conditions, for different durations, and from different products than in the DeRocco case; (d) and Janssens' alleged injury was different from the injuries in the DeRocco case.
2. The motives for cross-examination of Dr. Smith were markedly different after this case was filed than at the time Dr. Smith's deposition was taken because (a) there was an incredible growth of asbestosis litigation from 1976 to 1981; (b) in 1976 Johns-Manville made a conscious policy decision not to cross-examine Dr. Smith as fully as it otherwise would have under the circumstances of this case, citing as an example that Dr. Smith was an alcoholic under psychiatric care and was dismissed from Johns-Manville for this reason; and (c) Johns-Manville had no way to anticipate that Dr. Smith's deposition would be used against it in this and so many other asbestos cases.
3. The motives for cross-examination are markedly different in the two cases because of substantial advances since 1976 in medical knowledge concerning the effects of asbestos on the human body, mandating a substantially different approach to cross-examination of Dr. Smith on the subject of these changes in medical knowledge in 1981.
We find it unnecessary to discuss the out-of-state and federal cases cited by Johns-Manville.[11] Those decisions have not persuaded us that under the circumstances shown in this case the trial court erred in admitting Dr. Smith's testimony offered by the Janssens. The requirements of the former testimony rule are adequately met in this case. We reject each of Johns-Manville's three contentions for the following reasons:
1. The testimony of Dr. Smith in the DeRocco deposition concerned issues not *261 materially different from those in this case. Dr. Smith was questioned about Johns-Manville's knowledge during the 1940s that exposure to asbestos could be hazardous to persons over a long period of time, that the extent of such harmful effects was not fully known or agreed upon, and that he advised his superiors that something should be done to protect both employees of Johns-Manville and end users of its asbestos products. Dr. Smith's deposition was taken three years after the decision in Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), and at a time when Johns-Manville had knowledge that dozens of asbestosis cases had already been filed against it and more were being filed every month. The issues of Johns-Manville's knowledge of asbestos hazards and the company's failure to take action to protect either its employees or end users from such hazards were similar in DeRocco and the present case. Although the present case involved an additional issue of civil conspiracy, unlike DeRocco, that fact is not disqualifying since both cases alleged actual knowledge and failure to warn. Cf., McDougald v. Imler, 15 So.2d 418 (Fla. 1943). This latter issue was the principal subject on which Dr. Smith was examined in DeRocco and on which his testimony was offered in this case. Nor does Johns-Manville's objection that the plaintiffs were not the same in each case have any merit. Obviously, Janssens was not a party in the DeRocco case, but the plaintiffs in that case, like Janssens, were end users of asbestos products. The former testimony rule does not require that the same parties be involved in the former trial; it contemplates only that substantially the same issues between the parties be involved in both judicial proceedings. Johns-Manville's argument that the circumstances of Janssens' exposure were different and that his alleged injury was different are also without merit because Dr. Smith did not testify on those subjects. The fact is, he never knew or even heard of Janssens.
2. We reject the arguments that Johns-Manville's motive for cross-examination was sufficiently different between 1976 and 1981 to require rejection of the testimony. The test for admissibility does not depend on any factors affecting motive for cross-examination other than the existence of substantial similarity of issues giving rise to a similar motive to develop the testimony through cross-examination. The rule requires only that Johns-Manville had the opportunity to cross-examine on those issues and was legally called upon to do so. Johns-Manville had the opportunity to fully cross-examine Dr. Smith in the DeRocco case, and it was legally called upon to cross-examine on the failure-to-warn issues and Dr. Smith's credibility; all unasked questions relevant to those issues are thereafter deemed waived. Johns-Manville's strategic decision to forego questioning Dr. Smith about his alcoholic and psychiatric problems affords no legal basis for objecting to the use of that testimony in this case.[12] Johns-Manville's professed inability to foresee the various uses to which Dr. Smith's deposition might be put in future cases is likewise not a valid objection to use under the former testimony rule so long as the issues involved are similar.
3. Johns-Manville's inability to cross-examine Dr. Smith on the advances in medical science from 1976 to 1981 is wholly irrelevant because Dr. Smith's testimony was not offered by the Janssens to prove the state of medical knowledge at 1976; the testimony was offered to prove Johns-Manville's knowledge in the 1940s and 1950s and the company's deliberate course of conduct during those and succeeding years.
In summary, we hold that the record establishes all the requirements for use of Dr. Smith's testimony under the former-testimony exception to the hearsay rule, that its use in this case falls within the rationale of the rule, and that the trial *262 court did not abuse its broad discretion over the admission or exclusion of evidence in permitting the Janssens to read this testimony to the jury.
We have not overlooked the decisions cited by Johns-Manville that have refused to permit the Smith deposition to be used.[13] We are not persuaded to follow the rationale of these unreported trial court rulings.[14] Additionally, some of these rulings are clearly distinguishable because the court predicated its ruling on concerns not present or argued in this case. The Janssens have cited a number of reported appellate decisions from other jurisdictions which have permitted the use of Dr. Smith's deposition in subsequent judicial proceedings for reasons similar to those discussed above and, in some instances, for additional reasons not discussed here. We find that the rationale and grounds discussed in the following cases are particularly persuasive, being consistent with the rationale of the Florida evidence rule, and support the ruling of the trial court below. Clay v. Johns-Manville Sales Corp., 722 F.2d 1289 (6th Cir.1984); Hansen v. Johns-Manville Products Corp., 734 F.2d 1036 (5th Cir.1984); Moran v. Johns-Manville Sales Corp., 691 F.2d 811 (6th Cir.1982); Matter of Johns-Manville Asbestosis Cases, 93 F.R.D. 853 (N.D. Ill. 1982); Neal v. Carey Canadian Mines, Ltd., 548 F. Supp. 357 (E.D. Pa. 1982); Fischer v. Johns-Manville Corporations, 193 N.J. Super. 113, 472 A.2d 577 (App.Div. 1984).

(b)

MR. RUFF'S DEPOSITION
The deposition of Wilbur Ruff was taken in April 1979 in an action filed in the federal district court in Connecticut, In re General Dynamics Asbestos Cases (D. Conn., April 9, 1979), by asbestos product users claiming damages as a result of suffering asbestosis. Johns-Manville was a party to that action, was represented by counsel, and had the opportunity to fully cross-examine. Since Mr. Ruff died prior to the trial in 1981, his deposition testimony is admissible under the former-testimony rule and no question of the applicability of this rule is raised on appeal.
Mr. Ruff's testimony relates to Johns-Manville's policy during the years 1947 to 1961 of not informing employees that chest X rays made by Johns-Manville revealed the presence of asbestosis or other lung disease, the so-called "hush hush" policy in the words of Mr. Ruff. Johns-Manville objects to this testimony on two grounds: (1) The testimony was irrelevant to any issues in the case; and (2) the testimony was extremely prejudicial and inadmissible because Mr. Ruff was not competent to testify about Johns-Manville's policy. We reject both grounds.
The Ruff testimony was manifestly relevant to plaintiffs' claim that Johns-Manville deliberately followed a course of action designed to suppress information about the hazards of asbestos products. This has been fully discussed under issue I on punitive damages at page 3, supra, and need not be repeated.
Whether Mr. Ruff occupied an official position with Johns-Manville sufficient to authorize him to speak for the corporation about company policy, so that his knowledge and admissions would be imputed to the corporation, is of no concern in determining whether his deposition testimony about such policy was properly admitted. The trial court did not admit Mr. Ruff's testimony as an official speaking for the company, but carefully limited the testimony to factual matters within Mr. Ruff's personal knowledge based on his own observation and participation in transactions described. For this purpose, Mr. Ruff's competency as a witness did not depend on his authority as an agent of the company whose knowledge should be imputed to the company any more than did Dr. Smith's competency to testify about similar matters. Hansen v. Johns-Manville Products *263 Corp., 734 F.2d 1036, 1039 (5th Cir.1984). Accordingly, we find no error in the admission of this testimony.
After fully considering each of the points urged by Johns-Manville, we find no error of law or abuse of discretion requiring reversal of the judgment.
AFFIRMED.
SMITH and BOOTH, JJ., concur.

ON MOTION FOR REHEARING
ZEHMER, Judge.
Only one contention asserted in the motion for rehearing filed by Johns-Manville warrants further discussion, and that is the argument based upon White Construction Co. v. DuPont, 455 So.2d 1026 (Fla. 1984).[1]
Johns-Manville contends that our decision upholding the award of punitive damages in this case is in direct conflict with the Supreme Court's decision in White Construction. In that case, the evidence established that an employee of defendant operated a large earth loading machine at high speed, with knowledge that the brakes were defective, in an area where people were working and, being unable to stop, collided with a tractor trailer rig which rolled over the plaintiff, causing severe injuries and permanent disability. Emphasizing that these facts were held insufficient as a matter of law to allow the issue of punitive damages to go to the jury, Johns-Manville suggests that the Supreme Court, by expressly revitalizing the "strict legal standard for punitive damages" set forth in Carraway v. Revell, 116 So.2d 16 (Fla. 1959), has thereby retreated from "the more liberal standards set forth in American Motors Corp. v. Ellis, 403 So.2d 459 (Fla. 5th DCA 1981), Toyota Motor Co., Ltd. v. Moll, 438 So.2d 192 (Fla. 4th DCA 1983), and the other cases of similar vein cited in our original opinion. Johns-Manville contends that since the Supreme Court decision in White Construction, Florida "is now a state like Mississippi, in which punitive damages are not favored since punitive damages cannot be recovered even when the defendant has actual knowledge of a hazard and yet fails to warn or take corrective action."
We do not agree that Johns-Manville's interpretation of the White Construction case is correct. The majority opinion of the Supreme Court in that case made no effort to explain its rationale for not submitting the punitive damage issue to the jury under the facts stated other than quoting from Carraway. Nor did the Supreme Court explain that its decision in White Construction was intended to overrule or recede from any of the punitive damages decisions of the Supreme Court or the intermediate appellate courts of Florida. Rather, the Court merely characterized the particular facts of that case as nothing more than a single isolated instance of negligence, i.e., the defendant operated the loader even though aware that its brakes were defective. Apparently this single incident was not sufficient, in the Supreme Court's view, to satisfy the standard of conduct required for the award of punitive damages as stated in Carraway v. Revell, supra.
Unlike White Construction, the evidence in this case was substantially different in character and scope. Johns-Manville learned of the high probability of danger to thousands of persons manufacturing and using asbestos products over a period of years and, despite such knowledge, made conscious decisions at the executive level not to disclose the presence of this danger nor to alert affected individuals to the potential harm that could result from such exposure over a long period of time. Johns-Manville's conduct in this case is a far cry from the single incident of negligence in White Construction and is clearly of a character evincing a reckless disregard for human life or the safety of persons exposed to its dangerous effect, which supports a finding by the jury of a conscious indifference to consequences, wantonness, recklessness, and a grossly careless disregard of the safety and welfare of members *264 of the public. In short, the tortious acts by Johns-Manville in this case are not analogous to the single episode in White Construction, but are much more in keeping with the conduct held sufficient to support punitive damages in Louisville & Nashville R.R. Co. v. Hickman, 445 So.2d 1023 (Fla. 1st DCA 1983), pet. for rev. dismissed, 447 So.2d 887 (Fla. 1984).
The motion for rehearing is DENIED.
SMITH and BOOTH, JJ., concur.
NOTES
[1] For a detailed discussion of the disease of asbestosis, see Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1083-86 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).
[2] See generally the discussion of causation and liability in asbestosis cases in Copeland v. Celotex Corp., 447 So.2d 908 (Fla. 3d DCA 1984); and Copeland v. Armstrong Cork Co., 447 So.2d 922 (Fla. 3d DCA 1984).
[3] At least two states, Minnesota and Oregon, have statutorily adopted these criteria for punitive damages. Minn. Stat. Annot., § 549.20(3) (Supp. 1982); Ore. Rev. Stat., § 30.925(3) (1981).
[4] Since a manufacturer is legally obligated to make statements of warning to users of its products which are known to be dangerous to health, a manufacturer's intentional refusal to warn users of known dangers inherent in its products, even where the exact extent of its capacity to cause injury is not definitely known, is not unlike the tort of fraudulent misrepresentation. The latter tort consists of making a representation of material fact which the maker knows to be false or as to which the maker knows he possesses insufficient knowledge to be reasonably certain the statement is true or false. Evidence sufficient to make out a case of fraudulent misrepresentation for submission to the jury is also sufficient to require submission of the issue of punitive damages to the jury. Walsh v. Alfidi, 448 So.2d 1084 (Fla. 1st DCA 1984); Hutchens v. Weinberger, 452 So.2d 1024 (Fla. 4th DCA 1984).
[5] Apparently there is voluminous evidence that the asbestos industry has known for decades of the dangers involved in the use of asbestos products. Copeland v. Celotex Corp., 447 So.2d 908 (Fla. 3d DCA 1984), citing Borel v. Fibreboard Paper Products Corp., supra; Hardy v. Johns-Manville Sales Corp., 509 F. Supp. 1353, 1355 (E.D. Tex. 1981), rev'd on other grounds, 681 F.2d 334 (5th Cir.1982).
[6] The correspondence also commented that "one of our principal defenses in actions against the company on the common law theory of negligence has been that the scientific and medical knowledge has been insufficient until a very recent period to place upon owners of plants or factories the burden or duty of taking special precautions against the possible onset of the disease to their employees."
[7] This evidence has been characterized as "perhaps most damning of all." Fischer v. Johns-Manville Corp., 193 N.J. Super. 113; 472 A.2d 577, 580 (A.D. 1984).
[8] It should be noted that the Jackson case has been set for hearing en banc in September 1984 so that the panel opinion and decision is deemed vacated. Rule 41.3, Fifth Circuit Rules of Court, U.S.C.A., Court Rules.
[9] Section 90.407 reads:

Evidence of measures taken after an event, which measures if taken before it occurred would have made the event less likely to occur, is not admissible to prove negligence or culpable conduct in connection with the event.
[10] In the interest of fairness, we note that the objections related to the conduct of an attorney other than plaintiff's appellate counsel.
[11] E.g., Daniels v. Combustion Engineering, Inc., 583 S.W.2d 768 (Tenn. App. 1978); Rutledge v. Electric Hose & Rubber Co., 511 F.2d 668 (9th Cir.1975); Minyen v. American Home Assurance Co., 443 F.2d 788 (10th Cir.1971); Cahn v. Nicholas, 408 F.2d 1 (5th Cir.1969); Hewitt v. Hutter, 432 F. Supp. 795 (W.D. Va. 1977); aff'd, 574 F.2d 182 (4th Cir.1978); Northwestern Mutual Life Insurance Co. v. Linard, 57 F.R.D. 552 (S.D. NY 1972); Alamo v. Pueblo International, Inc., 58 F.R.D. 193 (D.P.R. 1972). We omit reference to the unreported rulings of a number of federal district courts cited in appellant's brief.
[12] Parenthetically, we note that the alcoholism issue was covered more extensively by Johns-Manville in the Louisville Trust deposition, which, of course, was permitted to be read at the trial in this case.
[13] All of the citations are to unreported rulings in federal district court cases.
[14] See Department of Legal Affairs v. District Court of Appeal, Fifth District, 434 So.2d 310 (Fla. 1983).
[1] After our original decision was released, the Supreme Court denied rehearing in that case.