493 So.2d 1067 (1986)
GULF POWER COMPANY, Appellant,
v.
James KAY and Carmen Kay, Appellee.
Nos. BE-411, BJ-71.
District Court of Appeal of Florida, First District.
September 3, 1986.
Rehearing Denied October 6, 1986.
*1068 Jack S. Graff, Fredric G. Levin, L. Terrye Coggin and M. Robert Blanchard of Levin, Warfield, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, for appellant.
Ted Taylor, Prattville, Ala., Woodburn S. Wesley, Jr. of Cotton, Wesley & Poche, Shalimar and Alan C. Sundberg and Sylvia H. Walbolt of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tallahassee, for appellee.
*1069 ZEHMER, Judge.
Gulf Power Company (Gulf Power) appeals a final judgment rendered pursuant to a jury verdict finding it guilty of negligence and awarding plaintiffs compensatory damages and punitive damages. Finding error in the admission of certain evidence, we reverse for a new trial.
James Kay and Carmen Kay filed a complaint against Gulf Power, the Department of Transportation (DOT), Bobby Ray Felch, and others, alleging that Carmen Kay (Ms. Kay) was injured while riding as a passenger in a vehicle driven by defendant Felch which collided with a power pole owned and maintained by Gulf Power. Prior to trial, all defendants except Gulf Power and Felch either settled or were dismissed from the action. The case proceeded to trial against these two defendants, and the jury returned a verdict of $7 million compensatory damages against both defendants and $4.2 million punitive damages against Gulf Power only. Judgment was entered on the verdict, Gulf Power's motion for new trial was denied, and this appeal followed.
While the appeal was pending, Gulf Power filed a motion for relief from judgment in the circuit court, alleging the judgment was procured by fraud or misrepresentation by an adverse party.[1] We relinquished jurisdiction to the trial court for consideration of the motion. The motion was denied, and appeal is also taken from that ruling.

I.
The evidence established that on the night of August 21, 1980, Ms. Kay was one of four people sitting in the front seat of the car driven by Mr. Felch. Three other people were sitting in the back seat. Although Mr. Felch had consumed some beer during the evening, there was no evidence establishing that he was legally intoxicated. The accident in question occurred as Mr. Felch drove east on a four-lane highway through a commercial area in Fort Walton Beach. Traveling thirty-five to forty miles per hour, within the posted speed limit, in the right hand lane of travel marked by white lines on the paved road surface, Mr. Felch proceeded across a bridge and into a gradual curve to the right. At the end of the curve, where the highway became straight, the right-hand demarcation line moved closer to the curb and then made a noticeable bend to the left as it began to run parallel to the curb. The power pole in question appeared to line up with the outside demarcation line at that point. It was located fifteen inches from the curb and thirty-three inches from the line marking the outside lane of travel.[2] Mr. Felch failed to stay in the marked lane of travel and his car continued straight into collision with the pole. The car did not swerve and no brakes were applied before striking the pole. As a result of the accident, Ms. Kay suffered severe injuries and is now a quadriplegic.
Originally the paved road in this area consisted of two lanes. Gulf Power maintained utility poles in DOT's right-of-way pursuant to an agreement for easement. In 1960 DOT reconstructed the road, repaved it, and put in curbs, parking lanes, gutters, and sidewalks. At that time DOT directed Gulf Power to relocate its power poles along the road and designated the location of the poles, including the pole involved in this accident. Upon completion of this reconstruction, the road still consisted of one lane for traffic in each direction, but had a concrete median and a parking lane on both sides adjacent to the curb and sidewalk. The utility pole involved in this accident was placed, in accordance with DOT instructions, approximately thirteen to fifteen inches from the curb and conformed to the applicable regulations governing placement of utility poles at that time.
In 1976 DOT removed a portion of the center median to create a left turn lane and *1070 converted the road into four lanes by changing the outside parking lanes into travel lanes. The road was restriped to delineate the center lane and two lanes of travel in each direction. As a result of these changes by DOT, the outside driving lane was closer to the curb and the power pole involved in this accident. The white line painted by DOT along the right edge of the new outside driving lane curved to the right toward the pole and then made a noticeable bend to the left just before reaching the pole. There was no evidence that Gulf Power was involved in these changes by DOT, nor was Gulf Power instructed by DOT to relocate any of its poles along this section of the road.
Testimony of Gulf Power employees revealed that some individuals employed by the company had expressed concern about the possible dangerous location of the pole in question and established that the pole had been struck by vehicles on at least two prior occasions. Each time the pole was repaired by Gulf Power and left in the same location.
Two experts in engineering and highway design testified on behalf of plaintiffs that the utility pole in question was located too close to the roadway, that the white stripe on the outside of the road led directly into the pole, that the pole did not have any reflectors, that there was a driveway break in the curb immediately prior to reaching the pole (which eliminated curb protection at that point), that the striping between the lanes of travel was not consistent with good design practice, and that there was an insufficient recovery area allowed between the road and the utility pole. They specifically opined that, based on good highway engineering practice and standards for highway design, the pole as located and maintained by Gulf Power constituted an unreasonably dangerous hazard to the driving public. In support of their opinions, these experts further testified that the pole's location violated certain written manuals and guides received in evidence over defendant's objections based on lack of relevancy. Plaintiffs contended that the manuals and guides were applicable and governing with respect to Gulf Power, and the experts were allowed to read various sections of these manuals to the jury in support of their opinions.
At the conclusion of extensive evidence on liability and damages, the court denied defendant's motion for directed verdict and ruled that the evidence was sufficient to justify submitting the issue of punitive damages to the jury. The jury returned a verdict finding Gulf Power sixty percent negligent, Mr. Felch forty percent negligent, and assessing $7 million compensatory damages against defendants jointly, and $4.2 million punitive damages against Gulf Power alone. Judgment was entered in accordance with this verdict.

II.
Gulf Power raises eleven points on this appeal. We have grouped several of them together for the sake of convenience in discussing them.

A.
The first point contends that the trial court erred in permitting several manuals and guides with which plaintiffs contend Gulf Power failed to comply to be received in evidence and read to the jury. The documents in question are: (1) "Manual of Uniform Minimum Standards For Design, Construction and Maintenance For Streets and Highways" (Manual of Minimum Standards), prepared and issued by DOT under date of July 1, 1976; (2) 1974 edition of "Utility Accommodation Guide," published by DOT; (3) 1979 edition of "Utility Accommodation Guide," published by DOT; (4) "Manual on Uniform Traffic Control Devices For Streets and Highways," published in 1971 by the United States Department of Transportation; and (5) American National Standard 1973 edition of the "National Electrical Safety Code," published by the Institute of Electrical and Electronics Engineers, Inc. No objection is raised on *1071 appeal to the electrical code,[3] so we limit out discussion to the first four documents.
Gulf Power objected to the four exhibits on grounds of relevancy, contending that none of these manuals and guides were applicable to the Gulf Power pole in question because they were promulgated long after the line of poles was installed in 1960, and that such standards did not obligate Gulf Power to relocate its pole when DOT changed the lanes in 1976. Plaintiffs, on the other hand, argued that the manuals and guides were applicable by reason of express language in each requiring compliance with its requirements for new construction whenever a roadway was involved in "reconstruction," and contended that whether the changes by DOT in 1976 constituted "reconstruction" was a factual issue for the jury. The trial court agreed with plaintiffs' position, but so far as we have been able to discern no instruction was given to the jury regarding its function in determining whether the 1976 changes constituted reconstruction.
Gulf Power contends on appeal that whether the documents were applicable to its pole is a question of law for the court since there were no disputed facts regarding the extent of DOT's 1976 changes to the road and Gulf Power's nonparticipation in such changes. Gulf Power does not dispute that the pole in question failed to comply with certain standards set forth in the manuals and guides.
Ordinarily, a change to a regulatory code or rule governing construction standards is not given retroactive effect to construction completed before its adoption except under limited circumstances to the extent expressly provided. See, e.g., Morrison Cafeterias Consolidated v. Lee, 215 So.2d 491 (Fla. 1st DCA 1968). Therefore, whether the trial court committed error in admitting any of the foregoing manuals and guides depends on the presence of express provisions regarding retroactive applicability either stated in the documents or provided in statutes or rules adopting such standards. The applicability of construction standards as governing a particular project is generally a question to be decided by the trial court unless the resolution of that issue depends upon disputed issues of fact. Krispy Kreme Doughnut Co. v. Cornett, 312 So.2d 771, 773 (Fla. 1st DCA 1975), cert. denied, 330 So.2d 16 (Fla. 1976); Morrison Cafeterias Consolidated v. Lee, 215 So.2d 491 (Fla. 1st DCA 1968). Upon a showing that the standards or codes may be applicable if the disputed facts are resolved one way rather than another, such documents should be admitted for the jury's consideration under appropriate instructions, Noa v. United Gas Pipeline, 305 So.2d 182, 185-86 (Fla. 1975); Krispy Kreme Doughnut Co. v. Cornett, 312 So.2d at 773, subject to appropriate hearsay objections, Sikes v. Seaboard Coast Line R.R., 429 So.2d 1216, 1220-22 (Fla. 1st DCA 1983), rev. denied, 440 So.2d 353 (Fla. 1983). Our task, therefore, requires analysis of the several documents, the record, and applicable statutes and rules to determine whether it was appropriate to permit the jury to decide that the subject manuals and guides were applicable to Gulf Power's pole here involved.
The Manual of Minimum Standards. Section 335.075(1), Florida Statutes (1983), originally enacted by chapter 72-328, Laws of Florida, states that "[t]he Department of Transportation shall develop and adopt uniform minimum standards and criteria for the design, construction, and maintenance of all public streets, roads, highways, bridges, sidewalks, curbs and curb ramps, crosswalks, where feasible, *1072 bicycle trails, underpasses, and overpasses used by the public for vehicular and pedestrian traffic." Pursuant to this directive, the Manual of Minimum Standards (MMS) was promulgated under date of June 1, 1976. Having reviewed the contents of the manual, the record, and the arguments of the parties, we fail to find any provision by statute or rule or in the document itself indicating that the MMS was intended to be directly applicable to Gulf Power relative to the maintenance of its utility pole at the time of this accident.
The MMS states on page one that all agencies and individuals involved in "the activities of planning, design, construction, reconstruction, maintenance or operation of streets and highways" shall be governed by its provisions and policies as provided therein. Although Gulf Power maintains utility poles pursuant to an easement on the right-of-way adjacent to the public road, it is not engaged in any of these specific activities. Nor is there any statute or rule that makes the standards in this manual directly applicable to a utility company such as Gulf Power.
It also appears from the MMS that whether the standards and criteria therein must be followed in a "reconstruction" project is a matter of discretion with the agency in charge of such reconstruction, in this case DOT.[4] The MMS provides, at page 6, that "the placement of utilities in the highway right of way should be closely regulated" and that "the planning and design of streets and highways should include guidelines and regulations for any utility activities within the highway right of way." These provisions indicate that Gulf Power's poles are subject to regulation by DOT in the exercise of its discretion, not that Gulf Power must in every instance of reconstruction relocate its poles in strict compliance with the manual. We recognize the MMS states, at page 88, that "[w]here it is necessary for a utility to locate within the highway, street or road, the placement and location shall not be in contradiction to or fail to meet the intent of the design requirements of this manual," but this provision is directed only to DOT in respect to the exercise of its responsibilities and discretion as noted above. The only provision in the MMS relating directly to Gulf Power is the reference on page 88 to the "Utility Accommodations Guide of the Florida Department of Transportation" as the regulatory guide covering utility companies such as Gulf Power.
We find no basis in this record for the trial court or the jury to conclude that Gulf Power was required by the terms of the MMS to relocate its pole in question. Whether the 1976 changes to the roadway should have required relocation of the poles was discretionary with DOT, and it was not for the jury to substitute its judgment for that of DOT in this matter. Yet the record clearly reveals that the MMS was introduced and used to demonstrate that Gulf Power had violated regulatory standards directly applicable to its operations which required relocation of the pole in question. This manual was not relevant and admissible for this purpose.
The Utility Accommodation Guides. These guides are made explicitly applicable to utility companies by the provisions of DOT rule 14-46.01, Florida Administrative Code. That rule provides that "[n]o person shall enter upon the right-of-way of any state road to construct, alter, or relocate any utility installation without prior authorization *1073 by the Department except as noted in the Department's Utility Accommodation Guide." Fla. Admin. Code rule 14-46.01(2). The trial court admitted the 1974 and 1979 editions of the Utility Accommodations Guide, apparently on the reasoning that these guides would be directly applicable to Gulf Power if the jury were to find that the changes in the road occurring in 1976 constituted "reconstruction." Plaintiffs support this ruling with the argument (see pages 27-28 of Appellees' Answer Brief) that not only is the Manual of Minimum Standards expressly made applicable to "reconstruction," but that "the Utility Accommodation Guide is likewise applicable to reconstruction projects." The brief purports to quote from the guide to the effect that major improvement projects such as "changes in pavement, shoulder, median or recovery area widths" should "where possible, meet the requirements for new construction as specified in this manual," citing to the record at pages 1865-66. The record at that point indicates, however, that the witness was reading from the Manual of Minimum Standards, not from either edition of the guide, and we have searched in vain for any provision in the guides indicating its applicability to "reconstruction" or any kind of construction other than future new projects.[5] Although the location of the utility pole in question would violate the standards in the Utility Accommodation Guide if set as a part of new construction, we are unable to find any basis in the evidence or in law to support a conclusion by the jury or the trial court that these guides were in any way made applicable to the Gulf Power pole in this case.
Any issue concerning whether DOT's 1976 changes to the road constituted "reconstruction" could have been submitted to the jury only in respect to the meaning of that term as defined and used in the Manual of Minimum Standards. Because this manual was not directly applicable to Gulf Power, however, the merging of its provisions on reconstruction with the requirements of the Utility Accommodation Guide was error. And, since the guides were used by plaintiffs for the purpose of showing that Gulf Power was in direct violation of governing regulatory standards, we hold that admission of the guides in evidence cannot be treated as harmless error.
Manual On Uniform Traffic Control Devices. Plaintiffs contend that this manual was admissible for the same reasons as the previous documents. Yet they do not point us to any provision that makes these standards applicable to utility companies maintaining poles along the road right-of-way such as in this case. We are unable to discern any relevancy of this document to the case against Gulf Power.
In summary, we hold that admission of these four documents in evidence was reversible error. We do not agree with plaintiffs that the Florida Supreme Court decision in Noa v. United Gas Pipeline, 305 So.2d 182, makes the above documents otherwise relevant and admissible because plaintiffs' expert witnesses testified that in their opinion the standards were applicable to the circumstances of this case. Noa involved the meaning of the term "service lines" as used in a duly adopted regulation clearly applicable to the defendant gas pipeline. Just the opposite occurred in this case since the nonapplicability of the regulatory requirements of the manuals and guides is clear as a matter of law. Even assuming that DOT's 1976 changes to the road constituted "reconstruction" as that term is used in the MMS, all plaintiffs' *1074 expert testimony could establish was their disagreement with DOT's failure, in the exercise of its discretion, to require compliance with new construction standards by directing Gulf Power to relocate its power lines during DOT's 1976 changes. This testimony would not establish any violation of the requirements by Gulf Power. Hence, we find Noa distinguishable for these and the additional reasons discussed in Krispy Kreme Doughnut Co. v. Cornett, 312 So.2d 771, 774.
Gulf Power also argues that the manuals and guides were inadmissible under the hearsay rule, citing Sikes v. Seaboard Coastline R.R., 429 So.2d 1216 (Fla. 1st DCA 1983). It is not necessary to reach that question, however, because the record indicates, as plaintiffs point out, that no such ground of objection was stated in the court below. This error, if any, has not been properly preserved for review on appeal. In re M.J.W., 453 So.2d 914, 916-17 (Fla. 1st DCA 1984).

B.
Appellant's second point on appeal contends that the trial court erred in submitting the issue of punitive damages to the jury. The legal standard applicable to this issue in negligence cases was recently reiterated by the Florida Supreme Court:
The character of negligence necessary to sustain an award of punitive damages must be of a `gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.
White Construction Co. v. DuPont, 455 So.2d 1026, 1029 (Fla. 1984), quoting Carraway v. Revell, 116 So.2d 16 (Fla. 1959). The Supreme Court did not indicate in White Construction any intention to change the applicable standard and recede from the long line of punitive damages cases antedating and postdating its opinion in Carraway, as we previously discussed in Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242, 247 (Fla. 1st DCA 1984), rev. denied, 467 So.2d 999 (Fla. 1985). Hence, the quoted standard is necessarily the beginning point for analysis of the sufficiency of the evidence to support the jury's award of punitive damages in this negligence case.
It appears from appellees argument that the primary basis for punitive damages was the evidence that prior accidents had occurred at the same pole and that Gulf Power, despite its awareness of these accidents and the obviousness of the danger to the traveling public caused by the location of the pole, did nothing to correct or even mitigate the dangerous condition. In addition, we are convinced that the jury was also probably persuaded to award punitive damages based on Gulf Power's failure to comply with "governing" standards in the manuals and guides improperly admitted for the jury's consideration.
Gulf Power complains in point five of its brief that the evidence of prior accidents was inadmissible for lack of a proper foundation showing the requisite similarity of circumstances. Gulf Power sought and obtained a pretrial ruling in limine that no evidence of prior accidents would be admitted without the proper showing of similarity of circumstances. During trial, however, no objection on this ground was made to any testimony referring to prior accidents. We agree with plaintiffs, therefore, that any error regarding admissibility of this testimony has not been properly preserved for appellate review.
The failure to object does not mean, however, that we should not review the circumstances of the prior accidents, including the apparent lack of similarity, in passing on the sufficiency of the evidence to support the punitive damages award. The record shows that between 1960 (when the pole was originally constructed) and *1075 1980 (when the accident in question occurred), two specifically identified accidents occurred at this pole. The pole was struck in January 1976, prior to the road construction that changed the parking lanes into travel lanes, but no evidence was presented showing the manner of collision and the circumstances surrounding it. Since the road conditions at the time of that accident were significantly different from the changed conditions existing in the instant case, we conclude that this evidence cannot legally support an inference of knowledge by Gulf Power of the special danger said by plaintiffs to be attributable solely to the location of this pole.
The only other accident specifically identified at trial occurred in 1979. The testimony of a witness to that accident revealed that it occurred at night, that the car was traveling in the same direction as the car in the instant case, and that the car struck the same pole. But the testimony also revealed that the car ended up ricocheting across five lanes of traffic and colliding with gas pumps at a service station on the other side of the road. Although the witness testified that he didn't know how fast the car was traveling, there was an indication in the record that the accident involved excessive speed. The record is also silent on whether intoxication or some other condition of the driver or condition of the vehicle caused the accident. The circumstances of this accident as proven at trial also lack sufficient similarity to the circumstances of the accident in the instant case to support an inference that Gulf Power's failure to move the pole after the 1979 accident amounted to a conscious indifference to the safety and welfare of the public traveling along this road.
Plaintiffs rely primarily upon our opinion in Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242, in arguing the propriety of the punitive damages award. But the facts in Johns-Manville presented a far more egregious situation than the instant case. There, the evidence supported a finding by the jury that the defendant manufacturer knew of the specific injury occurring from prolonged use of its asbestos products and intentionally covered up this knowledge and refused to warn of the dangers. 463 So.2d at 249-51. Gulf Power's knowledge of the two accidents at the pole in this case, in view of the lack of similarity of circumstances shown by the record before us, is not legally sufficient to support a finding of the gross and flagrant negligence required to support the award of punitive damages. White Construction Co. v. DuPont, 455 So.2d 1026, 1029. For us to hold otherwise would be tantamount to concluding that once a utility company's pole is struck by a vehicle leaving the roadway, regardless of the cause, that utility company may be liable for punitive damages for failing to relocate it. We know of no decision upholding that principle.
We hold, therefore, that the punitive damages award must be reversed because it was based in part on inadmissible evidence and because the evidence of prior accidents was insufficient to warrant submitting the issue to the jury. Whether plaintiffs might adduce additional evidence on retrial that will be legally sufficient to make out a case for the jury on punitive damages is a matter on which we do not speculate.

C.
Appellant next raises several points asserting error in permitting certain testimony from plaintiffs' expert witnesses. Gulf Power contends that the trial court erred because the experts were allowed to render opinions on matters outside their expertise, to invade the province of the jury, and to testify outside the evidence. Since our rulings on the admissibility of the manuals and guides used in much of the expert testimony will substantially affect the manner in which expert testimony can be presented on retrial, we find it unnecessary to review and decide each of the asserted errors.
We are confident that upon retrial the trial court will be careful to properly apply the provisions of section 90.703, Florida Statutes (1983), that "testimony in the form *1076 of an opinion or inference otherwise admissible is not objectionable because it includes an ultimate issue to be decided by the trier of fact," and section 90.704 relating to the basis of the opinion testimony by experts. These sections of the evidence code allow considerable latitude to the trial court in determining whether expert testimony should be admitted.
It is, of course, impermissible for an expert to give an opinion requiring special expertise in a discipline other than that in which the witness is shown to be qualified. See, e.g., Carver v. Orange County, 444 So.2d 452 (Fla. 5th DCA 1983). While we have some difficulty understanding the relevancy of the testimony of the high school driver training teacher, we will allow the trial court to reconsider this ruling anew if such testimony is tendered upon retrial. Similarly, it is highly questionable whether the expert testimony concerning the duty of care required of one engaged in good highway design and construction is relevant to Gulf Power's duty of care because it maintains a utility pole along DOT's right-of-way pursuant to an easement. We suggest that such testimony be subjected to rigid scrutiny if proffered on retrial. In short, we believe that the trial court will be careful not to exceed the bounds of its discretion in respect to the admission of expert testimony when this case is retried, and that no useful purpose will be served by a more detailed review of the asserted errors.

D.
Gulf Power also complains that the trial court erred in giving an improper jury instruction on intervening cause, contending that the instruction (1) constitutes a comment on the evidence by the court and (2) is adequately covered by the standard jury instructions.[6]See Fla. Std. Jury Inst. (Civ.) 5.1(c). The record of the charge conference does not show any objection by appellant on the first ground, but it does reflect a timely objection on the second. The instruction was given over this objection without a statement by the trial court "on the record or in a separate order the manner in which he finds the standard form erroneous or inadequate and the legal basis of his finding," contrary to the requirements of form 1.985, Florida Rules of Civil Procedure. Although the instruction given need not necessarily be construed as a comment on the evidence in the manner argued by appellants, we note that the instruction is poorly phrased and the matter appears to be adequately covered by the standard jury instructions. While we do not reverse because the instruction was given, neither do we expressly approve it. On retrial the court should be guided by the standard jury instructions or indicate on the record its legal reasons for not doing so.

E.
Gulf Power's next point is that the trial court erred in failing to direct a verdict in its favor, citing Speigel v. Southern Bell Telephone & Telegraph Co., 341 So.2d 832 (Fla.3d DCA 1977). Plaintiffs argue that they were entitled to have the jury decide the case, citing Padgett v. West Florida Electric Coop., Inc., 417 So.2d 764 (Fla. 1st DCA 1982), and other cases. We do not reach this point, however, because counsel for Gulf Power conceded at oral argument that the motion for directed verdict was properly denied. Accordingly, we treat this point as abandoned.

F.
The next point contends that it was error to allow the driver, Felch, to testify *1077 that he was not arrested or given a citation for driving under the influence of alcohol at the time of the accident. This was clear error, see Albertson v. Stark, 294 So.2d 698 (Fla. 4th DCA 1974), case dismissed, 299 So.2d 602 (Fla. 1974), which appellees do not seriously dispute.

G.
Appellant contends that the trial court improperly denied its motion for relief from judgment. In light of the reversal for a new trial, it is not necessary for us to reach this point.
The judgment against Gulf Power is reversed and the cause is remanded for a new trial.
REVERSED and REMANDED.
MILLS and SHIVERS, JJ., concur.
NOTES
[1] Fla.R.Civ.P. 1.540(b)(3).
[2] The photographs in evidence graphically depict the alignment of the pole with the right demarcation line at this point. The placement of the line of poles shown in the photographs is not unlike that widely seen in commercial areas of the cities and towns of Florida.
[3] Former rule 25-6.34, Florida Administrative Code, as amended in 1969, was marked in evidence as plaintiffs' exhibit 28. That version of the rule obligated utility companies to construct, install, maintain, and operate utility facilities in accordance with, inter alia, the National Electrical Safety Code. Although the current version of rule 25-6.34 does not include any reference to that code, the record does not reflect when that change occurred. However, it is conceded by all parties that, when originally set in 1960 and on the date of this accident, the pole in question was located in compliance with the set back requirements of the 1973 National Electrical Safety Code.
[4] The manual states at page 1:

These standards are intended to provide the basic guidelines for developing and maintaining a highway system with reasonable operating characteristics and a minimum number of hazards.
The standards established by this manual are intended for use on all new construction projects. It is understood that the standards herein cannot be applied completely to all reconstruction projects, however, the standards should be applied to the extent that economic and environmental considerations will allow.
Similarly, Section III provides at page 20, "Reconstruction and maintenance of existing facilities should, where feasible, be directed towards meeting these standards." "Reconstruction" is defined at page 3 as "[a]ny road construction other than new construction." It is undisputed that the road construction in this case was not "new construction."
[5] For example, the 1979 guide states at page 1:

While this guide governs on matters concerning future location, manner and methods for the installation or adjustment and maintenance of utilities on highway right of way, it does not alter current regulations pertaining to authority for their installation nor determination of financial responsibilities for placement or adjustment thereof.
We do not find any language in the guide that purports to require existing pole lines to be moved or adjusted whenever DOT makes changes to the roadway, provided that such changes do not physically intrude upon the existing pole line.
[6] The charge as given reads:

The Court further charges you that an intervening cause such as the alleged negligence of Bobby Ray Felch in this case is foreseeable if the type of harm has so frequently resulted from the same type of negligence that in the field of human experience the same type of result may be expected again. The Court further charges you that an intervening cause is foreseeable if the same type of harm has occurred previously due to the same type of negligent conduct and the defendant Gulf Power Company, in this case, had actual knowledge of this.
R. 2215.