Anne FELL, Appellant,

v.

KEWANEE FARM EQUIPMENT COMPANY, A DIVISION OF ALLIED PRODUCTS, Appellee.

No. 89–397.

Supreme Court of Iowa.

June 20, 1990.

As Modified on Denial of Rehearing July 24, 1990.

nism of a Kewanee Model 500 elevator. As a result of the accident Anne suffered mutilating injuries to her hand.

Following the accident Anne sued Kewanee Farm Equipment Company, the manufacturer of the elevator. Anne alleged that her injuries were caused by Kewanee's negligence. She also claimed that Kewanee breached its implied warranty. In addition, Anne sought relief on a strict liability theory. Anne asked for compensatory and punitive damages.

Anne also named her father-in-law, Lewis Fell, as a defendant. Lewis owned the elevator. As a third-party plaintiff, Lewis sought relief from Anne's husband, James. Before trial, Anne settled with Lewis, and Lewis and James were dismissed from the lawsuit.

Kewanee moved for partial summary judgment as to Anne's strict liability theory. The district court, the Honorable James L. McDonald presiding, sustained the motion. In a separate motion, Kewanee sought partial summary judgment on the implied warranty theory and on the request for punitive damages. The district court, the Honorable Murray S. Underwood, Senior Judge, presiding, sustained Kewanee's motions on these last two issues. Anne challenges these rulings on appeal.

The case proceeded to trial on the only remaining claim—Kewanee's alleged negligence. During trial, the district court, the Honorable Tom Hamilton presiding, sustained Kewanee's objections to evidence of prior accidents and to certain exhibits. Following the close of the evidence the district court instructed the jury as to Kewanee's state of the art defense as codified in Iowa Code section 668.12 (1987). In the special verdict forms, the court listed James Fell as a party against whom to apportion fault.

In accordance with the special verdict form, the jury found that Kewanee had established its state of the art defense. So the jury, as instructed, proceeded no further. The district court then entered judgment for Kewanee.

Randall G. Sease of the Sease Law Firm, Hartley, and Edmund J. Sease of Zarley, McKee, Thomte, Voorhees & Sease, Des Moines, for appellant.

David L. Phipps, Kevin M. Reynolds, and Maureen Roach Tobin of Whitfield, Musgrave & Eddy, Des Moines, for appellee.

LAVORATO, Justice.

Anne Fell was loading ear corn into a corn crib when her left hand became entangled in the exposed beveled gear mecha-

Anne challenges on appeal the district court's evidentiary rulings, its state of the art defense instruction, and its action in listing James Fell as a party in the special verdict forms. We affirm in part, reverse in part, and remand.

### I. *Background Facts and Proceedings.*

On the day of the accident—December 16, 1986—Anne and her husband, James, were loading ear corn into a crib. They were using a Kewanee Model 500 grain elevator to move the corn. The elevator was hooked to James' tractor, which supplied the power to operate the elevator.

The elevator is equipped with a power raise and lower attachment. A shifter lever is attached to the side of the elevator to engage the power raise and lower attachment. Movement of the lever toward the front of the tractor raises the elevator; movement of the lever in the opposite direction lowers it.

The shifter lever has holes at the top and bottom. Ropes can be threaded through the holes and extended to the tractor so that the tractor operator can activate the power raise and lower attachment from the operator's seat. The operator can pull one rope to raise the elevator and pull the other rope to lower it. The evidence is uncontroverted, however, that Kewanee, the manufacturer of the elevator, does not provide ropes for the elevator.

The following illustration is taken from the owner's manual, which is in evidence. The illustration depicts the shifter lever without ropes and with arrows indicating the directions that the shifter lever should be moved.

At the time Lewis Fell purchased the elevator he was given the wrong owner's manual. The owner's manual he did receive does not show a power raise and lower attachment with ropes attached to the shifter lever.

Next to the shifter lever is a beveled gear mechanism that controls the power raise and lower attachment. A factory-installed gear guard covers the beveled gear mechanism. Kewanee has designated the guard as 615–002 gear guard. The above illustration shows the guard covering the beveled gear mechanism.

The gear guard is held in place with a single wing nut on a carriage bolt which is designed to fit in an open-ended slot on the guard. The only point of attachment for the guard is the wing nut, carriage bolt, and open slot.

The following illustration is also in evidence. It shows the gear guard, carriage bolt, wing nut, and open-ended slot.

1. **Gear guard**

2. **Carriage bolt**

3. **Wing nut**

4. **Open-ended slot.**

At the time of Anne's injury, the gear guard was not in place. Lewis Fell testified—and his testimony is uncontroverted—that the guard had vibrated off several times after he purchased the elevator in 1969. The following illustration, which is also taken from the owner's manual, shows how the beveled gear mechanism and shifter lever look without the gear guard in place. The wing nut and carriage bolt are in place in the upper right-hand corner.

At the time of the accident, Anne was standing on the ground near the shifter lever. The elevator was in an elevated position because the couple had just used it to move corn into the crib. Anne had pushed the shifter lever with her hand to engage the lower attachment. She stepped back and the power raise and lower attachment popped out of gear. Anne then moved forward, grabbed the shifter lever with both hands, and pushed the attachment back into gear. While doing this, Anne's mitten and left hand became entangled in the exposed beveled gears. The gears caused severe mutilation and partial amputation of Anne's left hand.

II. *The Motions for Partial Summary Judgment.*

After some discovery, Kewanee filed two motions for partial summary judgment. The first motion went to the strict liability claim. The second went to Anne's breach of implied warranty claim and her request for punitive damages.

Summary judgment is appropriate when the moving party shows by way of pleadings, affidavits, and discovery that there is no genuine issue as to any material fact. Iowa R.Civ.P. 237(c). In considering such a motion, the district court must view the record in the light most favorable to the nonmoving party. *Anita Valley, Inc. v. Bingley,* 279 N.W.2d 37, 40 (Iowa 1979).

A. *Strict Liability.* Before enactment of Iowa Code chapter 668—Iowa's comparative fault law—the elements of a strict liability claim involving products included the following:

1. The defendant sold the product.

2. The defendant was engaged in the business of selling the product.

3. The product was in a defective condition at the time of sale.

4. The defective condition was unreasonably dangerous to the plaintiff.

5. The plaintiff used the product in the intended manner or in a manner reasonably foreseeable by the defendant.

6. The product was expected to and did reach the plaintiff without substantial change in its condition.

7. The defect was a proximate cause of plaintiff's damage.

8. The amount of damage.

*Osborn v. Massey–Ferguson, Inc.,* 290 N.W.2d 893, 901 (Iowa 1980); *Hughes v. Magic Chef, Inc.,* 288 N.W.2d 542, 545–47 (Iowa 1980); II Iowa Uniform Jury Instructions, No. 1000.1 (June 1987).

In *Magic Chef, Inc.,* we made it clear that "[m]isuse is not an affirmative defense but rather has to do with *an element of the plaintiff's own case.*" *Hughes v. Magic Chef, Inc.,* 288 N.W.2d at 545. Iowa Code section 668.1 defines "fault" to include "strict tort liability." "Fault" in section 668.1 also includes "misuse of a product for which the defendant otherwise would be liable...." Although one might argue that the legislature has made "misuse" an affirmative defense we take no position on this issue at this time. We decline to do so because the issue is not before us and the parties have neither briefed nor argued it.

In its motion Kewanee asserted that as a matter of law the elevator was not unreasonably dangerous and that there was a substantial change in the elevator after its sale.

The district court found that there was a genuine issue of material fact whether the elevator was unreasonably dangerous. But the court agreed with Kewanee that no genuine issue of material fact existed whether the elevator reached the consumer without substantial change. Specifically the court found

that the machine in question, which was fifteen years old, had been materially altered some twelve years after its purchase. The plaintiff became entangled in rotating gears that were originally shielded by a gear guard. This guard had been removed three years before [Anne's] accident. There is no genuine issue of fact generated by the record, and the court is compelled to find that the machine in question was altered by removing the gear box shield and that this alteration occurred after the delivery of the machine to the user.

Considering that Anne would be unable to establish one of the essential elements of her strict liability claim, the court sustained the motion and dismissed the claim.

Anne contends here that a genuine issue of material fact existed on both issues. We agree.

1. *Defective condition unreasonably dangerous.* Comment g to section 402A of Restatement (Second) of Torts (1976) defines "defective condition":

g. *Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.

Comment i to section 402A defines "unreasonably dangerous":

i. *Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably danger-

ous" in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.*

(Emphasis added.)

Leo C. Peters, a consulting mechanical engineer and a professor at Iowa State University, examined the elevator after the accident. Peters wrote a report about the design of the 615–002 gear guard. The report was a part of Anne's resistance to Kewanee's partial motion for summary judgment.

■ In Peters' opinion "the design of the 615–002 gear guard system is defective in that the mounting and attaching means are inadequate to keep the guard in a specified configuration and location during forseeable and expected usage of the elevator and the raising and lowering operations." Peters also believed that "the normal user would not appreciate the danger associated with a missing shield."

Peters based these opinions on several factors. First, the only attachment point for the guard "is on the top guard surface at the right corner nearest the elevator and consists of a wing nut on a ⁵⁄₁₆ by ⅝ carriage bolt. The other upper corner and the bottom of the guard are not attached in any way to the gear housing." Because of such a tenuous connection—Peters wrote—the guard

> is free to vibrate, be bent, swing out of position or fall off the gear housing if the wing nut is not properly tightened. This latter condition is because the carriage bolt does not come through the hole in the guard but instead is in a 0.344 inch by 1 inch slot cut through to the outer edge of the guard. In summary, it is easier for this gear guarding system to be knocked off or left off in an expected usage than it is to stay on and guard the gears and the gear box as intended.

Second, in Peters' opinion,

> it is foreseeable in spite of instructions in the owner's manual to operate the power raise and lower system from the tractor, it will be operated from the ground, thus bringing the operator to the vicinity of the gear box which has a hazard of exposed gearing if the gear guard is not in place as intended. The likelihood of the power raise and lower

lever being operated from the ground is increased by the fact that no rope is supplied with the elevator and the power raise and lower unit.

Last, a guard for a gear box—according to Peters—should meet at least the following criteria:

> a. It should be easier to install or replace properly than to remove, and should remain in place during foreseeable use and operation of the power raise and lower unit and the elevator.
>
> b. It should be easy to fabricate and install.
>
> c. It should provide easy access for necessary service functions.
>
> d. It should not interfere with the purpose or foreseeable use of the machine.
>
> e. It should provide protection for personnel in or around the vicinity of the gear box when properly in place.
>
> f. It should be physically and economically feasible.

The 615–002 gear guard—Peters wrote—fails to meet the first criterion because of the way the gear guard is attached. Peters believed the first criterion could be met in several ways, "all of which would better attach the guard to the gear box and all of which were known and in use on farm and other equipment during the 1960s."

A company memorandum was also a part of Anne's resistance. The memorandum, dated November 7, 1962, summarized a sales meeting held in October of that year. A paragraph of that memorandum was directed to the 615–002 gear guard:

> There was again a suggestion that we make our reduction unit shields stiffer out of heavier material and a suggestion that we have another bolt fastener on the # 615 shield, (Part No. 615–002 gear guard) to prevent it from rattling.

Last, the resistance contained the following excerpt from Lewis Fell's deposition:

Q. You stated that the shield would fall off. Did you do anything to cause that shield to become displaced or fall off? A. No, I did not.

Q. Do you know why it fell off? A. I expect just the vibration of the elevator running would shake it off in time.

Q. How is that shield held on, do you know? A. It's held on with one little wing nut in a slot in the shield.

Peters' report, the memorandum, and Lewis' deposition clearly generated a material fact question on the issue whether the elevator was in a defective condition. The design of the 615–002 gear guard was such that the guard could become detached because of its single and tenuous connection. And Lewis Fell's deposition confirms the expert's opinion: with enough vibration from the elevator the gear guard would eventually fall off the gear box housing. *Cf. Love v. Deere & Co.*, 684 S.W.2d 70 (Mo.App.1985) (guard fell off combine due to fatigue failure resulting from design defect; farmer's hand caught in exposed moving parts when he stumbled and fell toward combine).

A fact question also existed whether the elevator was unreasonably dangerous. A product is unreasonably dangerous [if] the product is dangerous and ... it was unreasonable for such a danger to exist. Proof of unreasonableness involves a balancing process. On one side of the scale is the utility of the product and on the other is the risk of its use.

. . . .

In strict liability the plaintiff takes the design as it was finalized in the finished product and shows it was both dangerous and that it was unreasonable to subject the user to this danger because the user would not contemplate the danger in the normal and innocent use of the product or consumption of the product. *Aller v. Rodgers Machinery Mfg. Co.*, 268 N.W.2d 830, 835 (Iowa 1978). Such proof does not necessarily rest on direct evidence. A plaintiff may, and usually does, establish that a product is unreasonably dangerous by circumstantial evidence. *Id.* at 834.

In line with what we said in *Aller*, we think that Peters' report generated several fact questions whether the elevator was unreasonably dangerous. For example, the expert noted there was a likelihood that a user would operate the shifter lever from the ground and bring the user into close contact with the exposed gear box. That likelihood was increased because Kewanee supplied no ropes with the elevator.

In addition, Peters stated that a normal user would not appreciate the danger posed by the missing gear guard when operating the shifter lever from the ground.

Finally, a fact question existed whether the risks in using such a product

outweighed the utility of the product. This is especially true in light of Peters' report that there were better means to attach the guard and meet his criteria of safety, and those means were all available in the 1960s.

2. *Without substantial change.* Under a strict liability theory a plaintiff must establish that the product was expected to and did reach the plaintiff without a substantial change in condition from the time it was sold. In other words, the defect must exist at the time the product was sold. A manufacturer or seller is not liable if the manufacturer or seller delivers the product in a safe condition and subsequent mishandling, alteration, or other cause beyond the seller's or manufacturer's control renders the product defective. Restatement (Second) of Torts § 402A comment g; *Aller*, 268 N.W.2d at 837.

We think Peters' report, the 1962 company memorandum, and Lewis Fell's deposition likewise generated a material fact question on this issue. In a deposition a company official said the design of the gear guard remained the same since 1960.

Unlike the district court we think there was a fact question whether the gear guard fell off the gear housing box because of vibration or was removed. Fell's deposition, the 1962 memorandum, and Peters' report generated such a fact question. *Cf. Love*, 684 S.W.2d at 74–75 (no substantial change found from user's efforts to reattach shield that fell off combine because of fatigue failure resulting from design defect). Peters' report also generated a fact question whether a different design, available when the elevator was manufactured, could have prevented the guard from vibrating off the gear housing.

We find that all of the cases which Kewanee cites on the issue miss the mark. In each of these cases there is evidence of active alteration such as removing a guard or shield.

We conclude the district court erred when it sustained Kewanee's partial motion for summary judgment on Anne's strict liability claim.

B. *Implied warranty.* Kewanee asserted in its second motion for partial summary judgment that Iowa's Uniform Commercial Code applied to Anne's implied warranty claim. Kewanee also asserted that Iowa Code section 554.2725—the UCC statute of limitations—barred the claim. The district court agreed and so do we.

We gather from the implied warranty count in the petition and from Anne's resistance that she was relying on an alleged breach of implied warranty of fitness for a particular purpose. Iowa Code section 554.2315 covers this warranty.

■ Iowa Code section 554.2725 provides in pertinent part:

*Statute of limitations in contracts for sale.*

....

2. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made....

Courts have taken three views about when the UCC limitations period as codified in section 554.2725 applies. The three views are succinctly set out in *Wieser v. Firestone Tire & Rubber Co.:*

The majority rule is that the UCC limitations period applies to all actions for breach of warranties, regardless of whether the plaintiff seeks personal injury damages or economic and contractual damages. A second approach distinguishes actions for personal injury damages, which are governed by general tort limitation periods, from actions seeking economic and contractual damages, which are governed by the UCC limitations period. A third view is that the UCC period governs breach of warranty actions unless there is no privity between the parties, in which case a tort limitations period applies.

596 F.Supp. 1473, 1475 (D.C.Colo.1984) (citations omitted).

We think the majority view is the better one and adopt it. It is logical that remedies under the UCC should be governed by the limitations period of the same statute. *Johnson v. Hockessin Tractor, Inc.,* 420 A.2d 154, 158 (Del.1980).

■ A five-year statute of limitations governs actions for breach of implied warranty. *See City of Carlisle v. Fetzer,* 381 N.W.2d 627, 628–29 (Iowa 1986). Applying section 554.2725, we think the alleged breach of implied warranty here occurred in 1969 when the elevator was delivered to Lewis Fell. So Anne's cause of action for the alleged breach of implied warranty began to run in 1969. The statute of limitations expired in 1974, some thirteen years before Anne filed suit.

We agree with Kewanee that the facts here demonstrate why the legislature might have thought a provision like 554.-2725 is desirable in the sale of goods. Lewis Fell conceded he had actual knowledge that the gear guard began falling off the elevator shortly after it was delivered. Had Lewis given Kewanee notice of the problem at the time, Kewanee might have corrected it.

■ C. *Punitive damages.* In its second motion for partial summary judgment, Kewanee also contended that it was entitled to summary judgment as to Anne's claim for punitive damages. The district court again agreed and sustained this part of the motion. Anne likewise challenges this ruling here.

To recover punitive damages the plaintiff must prove that the defendant's conduct amounted to "willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1.

One noted commentator defines willful and wanton conduct this way:

[T]he actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences.

*Prosser and Keeton on Torts* § 34, at 213 (1984). Tailoring this definition to product liability cases, one court has determined that

[a] legal basis for punitive damages is established in product liability cases where the manufacturer is shown to have knowledge that its product is inherently dangerous to persons or property and that its continued use is likely to cause injury or death, but nevertheless continues to market the product without making feasible modifications to eliminate the danger or make adequate disclosure and warning of such danger. Especially is this so when the evidence is susceptible to the inference that the manufacturer not only refused to warn for the user's protection, but intentionally took steps to cover up the known danger in order to protect continued marketing of the product for its own economic advantage.

*Johns–Mannville Sales Corp. v. Janssens,* 463 So.2d 242, 249 (Fla.App.1984) (citations omitted).

At the close of the evidence, Anne's counsel asked for an instruction on punitive damages. In asking for the instruction Anne's counsel said to the court, "We think we have made a prima facie case of knowledge which would entitle us to instructions on punitive damages under 668A." So although the district court sustained Kewanee's motion for summary judgment on the punitive damages issue, the parties actually tried it.

We think the evidence generated a jury question on Kewanee's knowledge that the gear guard was defective. But we are not convinced that the evidence was sufficient to establish that Kewanee's conduct in not changing the design was—in light of this knowledge—willful and wanton.

This is not a case in which Kewanee knew that people were being injured by exposed gears and ignored this knowledge for economic reasons. To the contrary, the evidence shows that Kewanee manufactured and sold thousands of these elevators without a similar incident occurring. Simply put, risk of injury from exposed beveled gears on the elevators was not so great as to make it highly probable that an injury would occur.

We conclude there was no reversible error on this issue.

### III. *Evidentiary Rulings.*

During trial, Anne sought to introduce several exhibits concerning injuries suffered by other users of Kewanee elevators. None of these injuries occurred in the beveled gears. The district court refused to allow the exhibits on the grounds of relevancy.

■ Despite Anne's challenge to the rulings here, we find no abuse of discretion. *See Cook v. State*, 431 N.W.2d 800, 803 (Iowa 1988) ("It is ordinarily within the trial court's discretion to decide whether to exclude evidence on grounds of relevancy"). Evidence of prior accidents is admissible to show a dangerous condition provided a foundational showing is made that the prior accidents have occurred under substantially the same circumstances. *Id.*

■ Here the prior accidents clearly did not occur under substantially the same conditions. We have relaxed the requirement when the evidence is introduced to show

notice. *Id.* In this case, however, we fail to see how Anne's evidence of prior accidents provided Kewanee any notice of design defect in the gear guard. This evidence we think would have tended to confuse the jury.

### IV. *State of the Art Defense Instruction.*

■ The state of the art defense in product liability cases is now codified in Iowa Code section 668.12, which provides:
*Liability for Products—State of the Art Defense.*

In any action brought pursuant to this chapter against an assembler, designer, supplier of specifications, distributor, manufacturer or seller for damages arising from an alleged defect in the design, testing, manufacturing, formulation, packaging, warning, or labeling of a product, a percentage of fault shall not be assigned to such persons if they plead and prove that the product conformed to the state of the art in existence at the time the product was designed, tested, manufactured, formulated, packaged, provided with a warning, or labeled. Nothing contained in this section shall diminish the duty of an assembler, designer, supplier of specifications, distributor, manufacturer or seller to warn concerning subsequently acquired knowledge of a defect or dangerous condition that would render the product unreasonably dangerous for its foreseeable use or diminish the liability for failure to so warn.

In short, the state of the art defense is a complete defense. However, a duty and corresponding liability still exists in a case of a defect that is unreasonably dangerous and that a defendant learns of later. For example, even though a product is state of the art, if a manufacturer later learns of a defect that is unreasonably dangerous, the manufacturer then has a duty to warn. And a failure to do so could render the manufacturer liable.

■ Here one of the specifications of negligence included the failure to warn. Section 668.12 applied and the district court did instruct on the state of the art defense. Anne contends, however, that the instruction did not go far enough because it did

not cover her theory. Her theory was that Kewanee failed to warn of a design defect in the gear guard that it learned of after the sale. Anne argues that the district court's failure to instruct on her theory of the case constituted prejudicial error.

In addition, the district court included the following special verdict form that Anne claims compounded the error:

Has Kewanee established its state of the art defense as to Anne Fell's claim of:
(A) Defective design of the 615–002 shield?
Yes___No___
(Answer only one)
(B) Defective warning?
Yes___No___
(Answer only one)
(C) Defective labeling?
Yes___ No___
(Answer only one)

Any of the above questions which are answered yes prohibit the jury from assigning fault to Kewanee regarding that issue. Fault may be assigned to Kewanee on any question answered no.

*If all questions are answered yes proceed no further except to sign the verdict form as provided and return it to the court attendant.*

As to questions which are answered no, you will proceed to verdict number one and answer the questions in order of their number according to the directions provided.

(Emphasis added.) Anne contends the italicized language incorrectly precluded the jury from deciding whether there was liability because of her theory of subsequently acquired knowledge. The jury answered all three questions "yes" and proceeded no further except to sign the verdict form.

If there is evidence to support it, the court must instruct on a party's theory of the case. Failure to do so constitutes prejudicial error. *See Schuller v. Hy–Vee Food Stores, Inc.*, 407 N.W.2d 347 (Iowa App.1987).

Kewanee responds that Anne failed to object to the marshaling instruction, which included the specification of failure to warn, and to the instruction on the state of

the art defense. Kewanee argues that in failing to do so Anne waived any error.

It is true that to preserve error on a failure to give an instruction, a party must object. *See Schuller*, 407 N.W.2d at 351. The underlying reason for the rule is to allow the district court an opportunity to correct the error. *Moser v. Stallings*, 387 N.W.2d 599, 603–04 (Iowa 1986). Anne's counsel did object to the special verdict form on the state of the art defense set out above.

In making his objection, counsel said: Additionally, Judge, with respect to this [special verdict form] and the application of 668.12, I think we are trying to say there should be some reference within the [special verdict form] so that it conforms with 668.12 that states that subsequently acquired knowledge of a defect does not mitigate defendant Kewanee's responsibility to warn and we do not see where that is addressed in the [special verdict form] and it is specifically set out by the legislature in that section of the code.

We think the objection sufficiently alerted the district court to Anne's theory of subsequently acquired knowledge.

We also think there was sufficient evidence to generate a jury question on this theory. The district court should have instructed the jury on it, and the court's failure to do so constituted prejudicial error.

What we said earlier in our discussion on "defective condition that is unreasonably dangerous" applies equally here. The factual matters we set out there, all of which were before the jury, generated a jury question whether the gear guard design made the elevator unreasonably dangerous.

■ In addition, the following evidence likewise generated a jury question whether Kewanee knew the gear guard design made the elevator unreasonably dangerous. In the 1960s Kewanee developed a prototype 615–002 gear guard with a safer bolt fastener. Yet Kewanee never implemented the new design. Earlier, we mentioned a 1962 memorandum that urged Kewanee to put another bolt fastener on the gear guard to prevent it from rattling. In 1978 Kewanee was again warned—via a notation

by an employee on a customer inquiry memo—that there was no bolt on the underside of the gear guard to hold it in place. Finally, in 1978 Kewanee's own consulting engineering firm told the company that guards off Kewanee elevators were seen in the field.

All this evidence suggests a reasonable inference that Kewanee knew the gear guard design was defective because the guard would eventually come off due to vibration. Additionally, because Kewanee supplied no ropes, Kewanee knew a user would probably operate the shifter lever by hand in close proximity to the exposed beveled gears. Peters' trial testimony, which amplified his written report, supports these inferences:

Q. Now, can you tell me is that rattling of the gear guard referred to there [in the 1962 memorandum] the type of thing that you would have expected as a mechanical engineer for this design? A. Yes, I would have.

Q. Okay. And when a design engineer sees the rattling of a guard like this, what does that indicate to him? A. It would indicate to me that something is loose and it isn't fitting the way that it should be, and that there is vibration enough to cause this to flex so that it is hitting something and rattling and that it is going to loosen whatever fasteners are on it.

Q. Should that rattling be of concern to a design engineer for proper shielding? A. In my opinion it should be, it would be to me.

. . . .

Q. Now, based on the materials that you have studied, do you know whether or not Kewanee supplies ropes with the 615? A. To my information Kewanee did not provide ropes.

Q. Dr. Peters, can you tell me if it is reasonably foreseeable from the standpoint of interaction between man and machines, that if the manufacturer does not supply ropes that the normal user of that machine is going to operate the shifter lever by hand? A. I don't know about normal users but most users would operate it by hand.

Q. Why do you say that? A. Because in my opinion as a design engineer they won't go and get a rope if one isn't supplied.

. . . .

Q. Can you tell me as of 1960 applying good mechanical practice do design engineers take into account the user's tendency to do the easiest and most expedient thing at the time? A. I was doing it when I was working for Deere in the 60s.

Q. Will that same thing be true as of 1969, should they take those things into account? A. Yes.

Q. Is that common practice and good engineering? A. We did it. I don't know whether other companies figure that way or not, but in my opinion they should.

### V. *Inclusion of James Fell as a Party Against Whom to Apportion Fault.*

Over Anne's objection, the district court included on the special verdict form James Fell, her husband, as a party against whom the jury could apportion fault. We agree with Anne that it was error to do so.

Anne originally sued Lewis Fell who later filed a third-party action against James. Before trial, Anne settled with Lewis. As a condition of settlement, Lewis agreed to dismiss his complaint against James.

█ Iowa Code section 668.2 defines a party as any one of the following:

1. A claimant.
2. A person named as a defendant.
3. A person who has been released pursuant to section 668.7.
4. A third party defendant.

We have interpreted this section to "preclude allocation of fault to nonparties whether they be unidentified, dismissed prior to trial, known parties to an occurrence for whom no relief is sought or acts of God." *Selchert v. State*, 420 N.W.2d 816, 819 (Iowa 1988) (citations omitted).

█ Anne argues that James was dismissed from the lawsuit before trial and so

is not a proper party for allocation of fault. Kewanee attempts to overcome the effect of the dismissal by arguing that James was a person released pursuant to section 668.7.

Section 668.7 provides that

[a] release, covenant not to sue, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation. . . .

The release here was entered into between Anne and Lewis Fell. Because James Fell was not a party to the release, we think section 668.7 does not apply.

This interpretation is faithful to our strict definition of "party" in section 668.2. We said in *Selchert* that a strict interpretation of section 668.2 would serve as a significant incentive for both plaintiffs and defendants to join all available parties who may be liable. *Selchert,* 420 N.W.2d at 819–20. Kewanee did not file a third-party action against James Fell. Kewanee's failure to do so is not in line with the underlying reason behind our strict interpretation of section 668.2.

VI. *Disposition.*

The district court incorrectly sustained Kewanee's partial summary judgment motion on Anne's strict liability claim. The record was sufficient to generate a material fact question on this issue. The court did, however, correctly sustain Kewanee's partial summary judgment motion on Anne's claim of breach of implied warranty. The statute of limitations had clearly expired on this claim.

There was insufficient evidence to submit the issue of punitive damages to the jury. So there was no reversible error on this issue.

The district court did not abuse its discretion when it refused to admit evidence of prior accidents. This evidence was not relevant because none of these accidents happened under substantially similar circumstances.

In the state of the art defense instruction, the district court should have instructed on Anne's theory that Kewanee subsequently learned of a defect that made its elevators unreasonably dangerous. There was sufficient evidence to generate a jury question on this issue.

Finally, in the special verdict forms the district court should not have listed James Fell as a party against whom the jury could apportion fault. James was dismissed before trial and was not a party to any release.

The parties have urged several other contentions and arguments. We have considered them and find that they have no merit.

We affirm in part and reverse in part. We remand for further proceedings consistent with this opinion on the strict liability claim.

The jury decided against Anne by way of special verdict forms the issues of negligent design and negligent failure to label. No error was claimed on these two issues. So we remand for new trial on the negligence claim but only on the failure to warn issue.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

All Justices concur except McGIVERIN, C.J., and SCHULTZ, CARTER, and SNELL, JJ., who dissent.

CARTER, Justice (dissenting).

I dissent. The record clearly demonstrates that this personal injury case has no merit under any of the legal theories which plaintiff urges.

In answer to the claim of error concerning removal of the strict liability claim from the case on a motion for summary judgment, the appellee devotes an entire

division of its brief to arguing that this claim has been mooted by the jury's response to the state-of-the-art interrogatories. The majority does not even speak to this issue. I submit that the appellee is entirely correct. The jury's acceptance of the state-of-the-art defense would have been a complete defense to the strict liability claim even if it had been submitted.

Plaintiff's strict liability claim should also be rejected on the merits. Plaintiff established a probability that the wing nut holding the auger shield would ultimately be loosened by vibrations, thereby causing the shield to fall off. The majority determines that this condition made the product "unreasonably dangerous" in the condition in which it left the manufacturer (with the shield attached). I submit that this is a doubtful conclusion. Assuming it is correct, however, a strict liability recovery tied to this defect should be limited to those instances in which there is some temporal proximity between the shield falling off and the injury for which recovery is sought. In the present case, the evidence shows that the owner of the machine had elected to leave the guard off the machine for a period of more than three years prior to plaintiff's injury. There was, I submit, a clear break in the causal chain which should preclude recovery as a matter of law against the manufacturer based on the loose wing nut.

The majority also finds error in the district court's refusal to submit a theory of recovery based on the manufacturer's alleged negligence in failing to warn of dangers discovered after the machine had left the manufacturer's hands. I agree that the state-of-the-art defense would not preclude recovery for this claim of negligence if plaintiff had made a submissible case under that theory. The plaintiff did *not* make a submissible case under that theory.

The alleged danger discovered by the manufacturer after the machine had been placed in the chain of commerce was the danger that the shield might fall off due to vibrations. I submit that the manufacturer's failure to warn of this danger does not provide a basis for recovery by a plaintiff who had actual knowledge that the shield was off when using the machine prior to and at the time of injury. I would affirm the judgment of the district court.

McGIVERIN, C.J., and SCHULTZ and SNELL, JJ., join this dissent.