Thomas HUGHES, Appellant,

v.

MASSEY–FERGUSON, INC., Appellee.

No. 93–548.

Supreme Court of Iowa.

Sept. 21, 1994.

William C. Fuerste of Fuerste, Carew, Coyle, Juergens & Sudmeier, P.C., Dubuque, and Alfred E. Hughes of Hughes & Trannel, P.C., Dubuque, for appellant.

Frederick G. White of Frederick G. White Law Office, Waterloo, and Ronald Pawlak, Troy, MI, for appellee.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

NEUMAN, Justice.

Appellant Thomas Hughes seeks a third trial in this suit for severe injuries he sustained while operating a combine manufactured by defendant Massey–Ferguson. The question on appeal is whether, as Hughes contends, the district court erroneously instructed the jury on a state of the art defense. Because we believe the issue was properly submitted, we affirm.

On the morning of October 7, 1986, Hughes was harvesting corn with a Massey–

Ferguson model 760 combine (MF760) purchased by his father in 1973. Trouble began when the six-row cornhead mounted on the front of the combine became clogged. Hughes was well aware of manufacturer warnings that the engine should be shut off before unclogging the head. He knew, however, that he could stop the machine's forward movement and, with the engine running, raise the cornhead to allow the mechanism to run and clear itself.

As the cornhead became clogged, Hughes noticed what he thought was smoke coming through the engine compartment. Fearing an engine fire, he felt he had to act quickly to determine the origin of the smoke. Instead of descending the cab steps and walking behind the combine to the engine compartment, he crossed the front of the machine by stepping over a guardrail surrounding the stair platform. With the engine running at full speed and the cornhead in the raised position, he placed his foot on the narrow three-inch rim of the cornhead's auger trough. As he took another step he lost his balance and fell into the auger. He was pulled into the "throat" of the machine, perilously close to the beaters, and ultimately lost his left leg.

Hughes sued Massey–Ferguson on theories of negligence and strict liability. A first trial, resulting in a jury verdict for Hughes, was reversed and a new trial ordered based on the court of appeals' finding that a jury question had not been engendered, and should not have been submitted, on the issue of strict liability. *See Hughes v. Massey–Ferguson, Inc.,* 490 N.W.2d 75, 78 (Iowa App.1992). Following retrial on the negligence claim only, the jury found that the combine and cornhead conformed to the state of the art for all specifications of negligence except adequacy of warning. It found that any fault from failure to warn, however, was not a cause of Hughes' injuries.

· On this appeal following denial of Hughes' motion for new trial, he claims the court erred in submitting the state of the art instruction because (1) the evidence was insufficient to support such a defense, and (2) his specific allegations of negligence involved such simple devices that the concept of state of the art does not apply.

## I. Sufficiency of the evidence.

Thomas contends that the expert evidence Massey–Ferguson put forth at best raised an issue regarding whether the combine and cornhead conformed to custom in the industry, not state of the art. Because the two concepts are not synonymous, Hughes claims the court erroneously instructed on an issue having no evidentiary support.

■ Our review is for the correction of errors at law. *Sandhorst v. Mauk's Transfer, Inc.,* 252 N.W.2d 393, 399 (Iowa 1977). When considering whether evidentiary support for an instruction exists, we give the evidence the most favorable construction it will bear. *Id.* If the record contains evidence to support a party's theory of defense, the court's decision to so instruct the jury should not be disturbed on appeal. *Id.*

Iowa Code section 668.12 (1991) governs the state of the art defense. It provides that in any action brought against a manufacturer for damages arising from alleged defects in the design of a product, "a percentage of fault shall not be assigned to such persons if they plead and prove that the product conformed to the state of the art in existence at the time the product was ... manufactured...." Iowa Code § 668.12.

■ Pertinent to the case before us, in *Chown v. USM Corporation,* 297 N.W.2d 218 (Iowa 1980), we drew a distinction between what is considered "custom in the industry" and what is "state of the art." We said that "[c]ustom refers to what was being done in the industry; state of the art refers to what *feasibly* could have been done." *Id.* at 221 (emphasis added). Our decision recognized that custom may well lag behind technological developments. *Id.* at 222; *accord O'Brien v. Muskin Corp.,* 94 N.J. 169, 182, 463 A.2d 298, 305 (N.J.1983). The question, we concluded, "is not whether anyone else was doing more, although that may be considered, but whether the evidence disclosed that anything more could reasonably and economically be done." *Chown,* 297 N.W.2d at 221 (quoting *Hancock v. Paccar, Inc.,* 204

Neb. 468, 479, 283 N.W.2d 25, 35 (1979)). Thus a jury may consider industry custom as evidence of state of the art, but such evidence does not establish conclusively the state of the art defense. *Id.* at 222; *see also Hillrichs v. Avco Corp.*, 514 N.W.2d 94, 98 (Iowa 1994) (compliance with industry custom not a complete defense).

As the term is used in this context, "feasibility" connotes product design that is practically, as well as technologically, sound. *Chown*, 297 N.W.2d at 222. Other courts have applied the doctrine similarly. *See, e.g., Crittenden v. Fibreboard Corp.*, 58 Wash. App. 649, 651, 794 P.2d 554, 555 n. 2 (1990); *O'Brien*, 94 N.J. at 183–84, 463 A.2d at 305. Still others suggest that government regulations may furnish a proper standard by which to measure feasibility. *See, e.g., Frazier v. Kysor Indus. Corp.*, 43 Colo.App. 287, 293, 607 P.2d 1296, 1301 (1979), *rev'd on other grounds*, 642 P.2d 908 (Colo.1982). We believe evidence on any one or all of these factors would be relevant and material on the question of whether a state of the art defense has been sufficiently established to warrant submission to the jury.

Turning to the record before us, we are satisfied that the defendant tendered proof of compliance with state of the art—not just industry custom—on each of the specifications of negligent design alleged by Hughes. The evidence consisted primarily of the testimony of plaintiff's expert, John Sevart, a mechanical engineer with admittedly little or no experience in the design or manufacture of farm equipment. Sevart's opinions were countered by defendant's experts Earle Morton, a product safety engineer at Massey–Ferguson who worked on the MF760, and Wayne Slavens, a retired John Deere engineer who designed combines and cornheads for that manufacturer. What follows is a summary of the competing testimony offered on each of Hughes' allegations of negligent design.

1. *Cover over auger.* Sevart opined that a simple mesh cover over the auger would have prevented an operator like Hughes from becoming entangled in the machinery in the event of a fall. He testified that certain models of John Deere combines manufactured before 1960 contained such guards.

Morton countered that in 1973, all but two of the major combine manufacturers produced open augers; within just a few years *all* went with open augers. A shielded auger was not technologically practical in 1973, he suggested, because testing and experience revealed that a cover—whether solid or mesh—would interfere with crop flow into the auger and obstruct the operator's critical view of the cornhead and its contents. Furthermore, he stated that the auger was "guarded by location," a concept approved by the American Society of Agricultural Engineers (ASAE) and federal OSHA standards. Under this concept, the open auger was intentionally located in an area difficult to access, thereby minimizing the risk of exposure. This inaccessible location, Morton testified, was the safety equivalent of using a metal auger cover. Expanding on this safety consideration, Slavens testified that a covered auger, by increasing the likelihood of clogging, would enhance the chance of personal injury by inviting the operator into the area of the obstruction. He also disputed the feasibility of placing a covered auger on a multirow cornhead due to increase in weight, power drives, and cost.

2. *Guardrailing.* Sevart opined that a guardrail between the area of access to the engine compartment and the unguarded cross auger and beaters would provide needed safety for operators checking engine malfunctions. He acknowledged that no other combine manufacturer utilized such railings. He stated, however, that a simple guardrail made of ordinary metal tubing, such as the one Hughes' father installed after the accident, was consistent with technology available in 1973.

Morton testified that the manufacturer elected not to install railings on the back of the cornhead because the operator did not need to be in that area when the machine was running. Existing railings next to the cab were meant to direct the operator *away* from the head when exiting the machinery. Both he and Slavens testified that the railing suggested by Sevart would be counterproductive to the operator's safety, inviting the

operator into a zone of danger. Additionally, Slavens testified that a railing in this location would obstruct the operator's view from the cab and unnecessarily complicate the use of machinery attachments.

3. *Access route to engine compartment.* Sevart cited ASAE standards requiring that steps and handholds be provided to facilitate entry to and exit from operating and servicing positions. Hughes complained that, unless the operator chose to climb down from the cab and cross behind the machinery to service the engine, the operator was forced to cross in front of the cab—which slants forward—where there are no handholds.

Noting that other major manufacturers limited the safety access routes on the machinery in 1973, Morton stated that Massey–Ferguson only put handholds where it wanted the operator to be. Slavens testified that he knew of no combine manufacturer that condoned checking or servicing the engine with the cornhead up. He believed that a company which provided a means of servicing the engine with the head up and auger turning would have been in violation of ASAE standards.

4. *Shutoff device.* Sevart claimed that the combine should have been equipped with an emergency shutoff device to aid an operator experiencing difficulties while outside the cab. He suggested it would have been easy to install a cable along the back of the cornhead which an operator could pull to disengage the power. He admitted that he had never tested the feasibility of such a device on a combine, nor was he aware of any other cornhead manufacturers using such a feature. He noted that the use of such devices on other machinery in 1973, however, was not unusual. He also suggested that alternative safety features would have included a seat switch or clutch.

Morton testified that in 1973 a disengaged clutch suitable for a machine the size of the MF760 had not yet been developed. As for the idea of a safety cable, he rejected its feasibility on two grounds. First, the process of harvesting cornstalks would tend to trip the device and stop the machine unnecessarily. Second, exposure of the device to the elements would likely make it unreliable. Along with Slavens, who expressed concern that such a cable would be out of reach of one caught in the auger, he feared such a device would give the operator a false sense of security, contrary to safety.

5. *Warnings.*[1] Although Hughes conceded that the combine carried many warning decals instructing the operator to stop the machine before servicing it or unclogging the header, Sevart told the jury that the warnings were inadequate. He believed that danger signals should have been affixed in areas of potential access to the throat. He also believed use of the word "caution" was too weak to convey the machinery's danger. Hughes also claimed the Massey–Ferguson warnings were not state of the art because they failed to advise the proper procedure in case of an engine fire. Nor did the warnings (1) caution that the three-inch ledge behind the header was not a step, (2) designate the desired route from the first step to the throat, or (3) advise whether the head should be up or down during servicing.

Morton countered that the warnings and instructions conformed to industry custom and ASAE standards. He acknowledged the operating manual did not warn the operator to lower the cornhead to access the throat; he believed it unnecessary to state "the obvious." He advised that the manual instructed the operator to keep a fire extinguisher in the cab in the event of engine fire. Slavens offered his view that too many "no step" signs might result in their ultimate disregard, thereby actually endangering the operator.

6. *Handholds.* Finally, Sevart alleged inadequate design in the lack of handholds on the forward-tilting windshield area crossed by Hughes to access the engine compartment. Morton, responding as he had to the charge of insufficient access routes, reiterated that safety dictated providing handholds only where the operator is supposed to be.

---

1. Although appellant here makes no such contention, another opinion filed today holds that the state-of-the-art defense under § 668.12 has no application to claims based on negligent failure to warn. *See Olson v. Prosoco,* 522 N.W.2d 284, 290–91 (Iowa 1994).

The combine was designed to provide accessible handholds only when the cornhead was down.

Taken together, we believe this evidence is more than ample to support the court's submission of state of the art defense instructions. Evidence of industry custom in 1973 was clearly supplemented by testimony concerning issues of technology, safety, practicality, and economics driving the manufacturing decisions. Evidence was also tendered on pertinent engineering and government standards guiding those choices. As this court noted in *Chown*, "[n]ot every safety device for which technology exists is necessarily feasible." *Chown*, 297 N.W.2d at 222. Contrary to Hughes' contention, the jury was not asked to apply state of the art law to a record containing no more than custom in the industry evidence. The assignment of error is without merit.

II. *"Simplistic claims" and state of the art.*

■ Hughes' second argument on appeal is less conventional. He claims that all of the devices described above—shields, handles, guardrails, danger signals—are so simple and straightforward that some date back to the "cavemen." That being so, he asserts they cannot possibly be regarded "state of the art." He thus claims error in the court's refusal to withdraw the issue from the jury.

Although superficially appealing, Hughes' argument is unpersuasive. Devising a simple railing, for example, might not have been a technological breakthrough in 1973, but attaching it safely to a large and powerful combine clearly calls for engineering expertise. According to Massey–Ferguson's experts, the homemade railing installed by Hughes' father was neither safe nor reliable by industry standards because of its inability to withstand the machine's vibrations during operation. The same considerations would apply to all of the devices proposed by Hughes and rejected by Massey–Ferguson, including the adequacy of warning signals. *See Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 921 (Iowa 1990) (applying state of the art defense to claim of failure to warn).

In conclusion, we believe the court properly submitted the state of the art issue to the jury for its careful consideration. Finding no error, we affirm the judgment entered upon the jury's verdict.

**AFFIRMED.**

All justices concur except TERNUS, HARRIS and LAVORATO, JJ., who concur specially.

TERNUS, Justice (concurring specially).

I concur in the majority opinion and agree that the judgment in favor of Massey–Ferguson should be affirmed. Although Hughes complains that the record did not support submission of a state-of-the-art defense, he did not object to the proposed state-of-the-art instruction. That instruction, I believe, was unnecessarily broad. I write separately to convey my belief that we should take this opportunity to more narrowly define "state of the art" in a way that distinguishes this affirmative defense from the elements of the plaintiff's case.

State of the art is a confusing concept as one commentator has aptly pointed out:

And what about "state of the art"? "State of the art" is a chameleon-like term, referring to everything from ordinary customs of the trade to the objective existence of technological information to economic feasibility. Its meanings are so diverse and so easily confused that the wise course of action, I think, is to eschew its use completely.

John W. Wade, *On the Effect in Product Liability of Knowledge Unavailable Prior to Marketing*, 58 N.Y.U.L.Rev. 734, 750–51 (1983). The suggestion to abandon state of the art as a distinct concept is tempting. However, that alternative is not available to us in design defect cases because the legislature has codified state of the art as an affirmative defense in Iowa. *See* Iowa Code § 668.12 (1993).[1]

Section 668.12 is problematic for two reasons. First, it does not contain a definition of the term "state of the art." Second, the statute makes state of the art an affirmative

1. Hughes did not challenge the applicability of section 668.12 to *negligent* design cases.

defense that the defendant must plead and prove. Thus, it is left to the court to define "state of the art" so as to give the defendant the benefit of this defense as envisioned by the legislature. However, at the same time we must be careful that we do not define the term so broadly that the affirmative defense subsumes the plaintiff's case, thereby shifting the burden of proof to the defendant.

I believe the majority has done just that. By injecting considerations of safety, economics and practicality into state of the art, this defense has become nearly indistinguishable from the concept of negligence or in the case of strict liability, the concept of unreasonably dangerous, elements we have traditionally required the plaintiff, not the defendant, to prove.

An understanding of this problem is most easily gained by first examining what the plaintiff must prove in a products liability case alleging a design defect.[2] Although this is a negligence case, I consider both negligence and strict liability theories since any definition of state of the art we use here would presumably apply in a strict liability case as well.

In proving liability under a negligence theory, a plaintiff must prove that the defendant failed to design the product "to be *reasonably safe* when used in a reasonably foreseeable manner." *Hillrichs v. Avco Corp.*, 514 N.W.2d 94, 97 (Iowa 1994) (emphasis added). Safety and any other factor reflecting on the reasonableness of the defendant's conduct are components of the plaintiff's case under a negligence theory.

In proving liability under a strict liability theory, the plaintiff must prove that a design defect made the product unreasonably dangerous. *Fell v. Kewanee Farm Equipment Co.*, 457 N.W.2d 911, 918 (Iowa 1990). Proof of unreasonableness requires the jury to balance the utility of a product against the risk of its use. *Id.* In deciding whether the risks outweigh the utility, the jury may consider the availability of "a safer alternative design." *Chown v. USM Corp.*, 297 N.W.2d 218, 220–21 (Iowa 1980); Keith Miller, *Design Defect Litigation in Iowa: The Myths of Strict Liability*, 40 Drake L.Rev. 465, —— (1991) ("One of the more critical factors courts consider in their design risk-utility analysis is proof an alternative product design is available."). *See Fell*, 457 N.W.2d at 918 (fact question on unreasonably dangerous element of plaintiff's case generated in part by evidence that a safer design existed at the time the product was manufactured).

The *Chown* court's definition of the unreasonably dangerous element is enlightening:

> In a design case, the risk-utility analysis involves the balancing of "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a *safer* alternative design, the *financial cost* of an *improved* design, and the *adverse consequences* to the product and to the consumer that would result from an alternative design."

*Chown*, 297 N.W.2d at 220–21 (quoting *Barker v. Lull Eng'g Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 237, 573 P.2d 443, 455 (1978) (emphasis added)). Thus, safety, economics and practicality are factors to be considered in determining whether the plaintiff has met plaintiff's burden of proof.

Here, the majority has incorporated these factors into the state-of-the-art defense. The majority relies on evidence that the suggested alternative design was not as safe as the defendant's design, that the alternate design was impractical and made the product less functional and that the alternate design was costly. These considerations should more properly be factors in the plaintiff's case, not the defendant's affirmative defense. The result of the majority's analysis is that the burden of proof has effectively been shifted to the defendant.[3]

---

**2.** Although one of the specifications of negligence in this case was based on a failure to warn, the focus of my discussion is on the design defect allegations. I ignore the failure-to-warn specification because under our holding in *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 291 (Iowa 1994), state of the art is no longer a defense in a negligent failure to warn case.

**3.** I refer to the burden of persuasion, not the burden of producing evidence.

I suggest that we limit the scope of the state-of-the-art defense to minimize any overlap with the elements of the plaintiff's case. The most effective way to prevent overlap is to define state of the art narrowly to mean the level of scientific and technical knowledge existing at the time the product was designed and manufactured. Gary C. Robb, *A Practical Approach to the Use of State of the Art Evidence in Strict Products Liability Cases,* 77 N.W.U.L.Rev. 1, 5–6 (1982). The defense would focus solely on the technological possibility of an alternate design.

If an alternate design is not technologically possible, it makes sense that the defendant would not be liable for failing to use a design that had not been invented or could not have been made. On the other hand, if an alternate design was possible under the then existing scientific and technical knowledge, the burden should shift to the plaintiff to prove that the defendant should have used the alternate design instead of the design actually used. This analysis, weighing the merits of the product's design against the merits of the alternate design, is accomplished under the risk-benefit analysis used to determine whether the product is unreasonably dangerous. Our current test for unreasonably dangerous would be modified only slightly to remove as a factor "the mechanical feasibility of an alternative safer design." The existence of an alternate design would already have been determined in the jury's consideration of the defendant's affirmative defense of state of the art. Whether the alternate design is a safer design would be part of the jury's risk-benefit analysis when it considers "the adverse consequences to the product and the consumer that would result from an alternative design."

In summary, under the approach I suggest, the court would first instruct the jury to consider the defendant's state-of-the-art defense. To be successful, the defendant would have to prove that the alternate design suggested by the plaintiff was not possible under the scientific and technical knowledge existing at the time the product was designed and

manufactured.[4] If the defendant failed in this defense, then the jury would consider whether the plaintiff had proved that the advantages of the alternate design, already determined to be technologically possible, outweighed the disadvantages of the alternate design and should have been preferred over the design used by the defendant. This latter analysis would be made using the *Chown* factors for unreasonably dangerous as modified above.

Now we must determine the impact of this suggested analytical framework on this case. Hughes argues in substance that the evidence was insufficient to support a state-of-the-art defense because the defendant offered no proof that the alternate designs suggested by Hughes' expert were not technologically feasible. Thus, Hughes is arguing for a narrow definition of state of the art.

The problem Hughes has in this case, however, is that he did not make this argument when the jury was instructed. Consequently, the jury was instructed that state of the art meant

> what technologically and *practically* could have been done at the time of manufacture, based on the latest scientific knowledge and discoveries in the field, to design, manufacture, and market the combine in a manner *that would have prevented the injuries while meeting the consumer's needs.*

(Emphasis added.) This broad definition goes beyond the consideration of mere scientific and technical knowledge. Hughes did not object to this instruction. Consequently, he cannot argue on appeal that the evidence was insufficient to support submission of the state-of-the-art defense as he now narrowly defines it. For this reason, I concur in the majority's decision to affirm the jury's verdict.

HARRIS and LAVORATO, JJ., join this special concurrence.

---

4. In the unusual case where no alternative design is suggested by the plaintiff, this definition would have to be slightly modified.